# WHEELING.

## CHALFANTS v. MARTIN.

Submitted June 9, 1884.—Decided December 13, 1884.

1. Except in the special case provided for by statute, where the answer in the nature of a cross-bill asks affirmative relief, no special replication can be filed. If the answer makes it necessary that the particulars of a transaction should be pleaded, the plaintiff should amend his bill,   (p. 397.)

2. Where a bill is filed to enforce a judgment-lien, and the answer avers payment and a receipt of plaintiff's attorney for the amount of the judgment, a general replication to the answer puts in issue the execution of the receipt, the authority of the attorney to receive the money, and whether or not it was procured by a fraudulant combination between the judgment-debtor and the attorney of the judgment-creditor with the purpose to defraud such creditor.   (p. 397.)

3. No decree shall be reversed for want of a general replication to the answer, where the defendant has taken depositions, as if said general replication had been filed.   (Code, sec. 4, chapter 134.)   (p. 398.)

4. While it is true, that a payment made to an attorney is a good payment on his client's claim, yet such payment, to operate as a discharge of the debt in whole or in part, must be made in good faith, or the money must be paid to the creditor by the attorney.   (p. 404.)

5. If the attorney and the debtor enter into a fraudulent agreement,

· that the debtor will pay the attorney a part of the claim and is to receive and does receive a receipt for the whole, and it is understood between them, that the money so paid is not to go to the creditor, but to be kept by the attorney, the payment made under such circumstances is not a payment on the claim ; and the debtor will not receive credit therefor, unless the attorney pays it to his client.  (p. 404.)

6. A payment so made can not inure to the benefit of the surety of the principal debtor, any more than to the benefit of the fraudulent principal himself.  (p. 404.)

The facts of the case appear in the opinion of the Court.

*R. White* for appellants.

*J. Morrow, Jr.* for appellee.

JOHNSON, PRESIDENT :

At September rules, 1878, in the circuit court of Marion county the plaintiff, David I. Martin, filed his bill to enforce the lien of a judgment against the real estate of the defendants, Solomon H. Chalfant and John Chalfant.  The judgment recovered was for $2,800.00, to be discharged by the payment of $1,987 and —cents.  The judgment was recovered on an injunction-bond.  The bill does not state, whether the defendant, S. H. Chalfant, owned any land or not; but it does allege, that John Chalfant owns real estate, and exhibits one deed and charges that he owns other lands.  The defendants severally answered the bill, and both answered that the said judgment had been fully paid off by said Solomon Chalfant to A. J. Conway, the attorney of the plaintiff, and exhibits with the answer of S. H. Chalfant what purports to be the receipt of said Conway in the following language :

"WEST VIRGINIA, April 1, 1878.

"Received of Solomon H. Chalfant $1,895.20 (one thousand eight hundred and ninety five dollars and twenty cents) being the full amount of judgment, interest and costs in the case of David I. Martin against S. H. Chalfant, it being the full amount of judgment, interest and all costs whatever arising or growing out of the original judgment against said S. H. Chalfant, also includes all interest and costs arising or growing out of or upon a motion for an execution on a for-

feited forth-coming bond, in which Joseph B. Nay was surety for S. H. Chalfant, and all interest and costs arising or growing out of a chancery suit in said case, and all interest and costs arising or growing out of a suit against Solomon H. Chalfant and John Chalfant, the above to be in full satisfaction of all the named causes whatever arising or growing out of the original judgment against S. H. Chalfant and in favor of the said David I. Martin and all interest and costs whatever arising or growing out of any and all actions in said cause.

"A. J. CONWAY,

"Attorney for David I. Martin."

The plaintiff filed a joint special replication to said answers and afterward filed a special replication to each of said answers; and in these special replications he denied generally the truth of the answer to which it related, and set up specially, that if said receipt was ever given by A. J. Conway, it was by a fraudulent combination between said S. H. Chalfant and said A. J. Conway to cheat and defraud plaintiff out of his judgment, and was not in any way binding on the plaintiff.

To the filing of these special replications the defendant objected; but the objection was overruled, and the replications were filed.

On December 23, 1881, the court reciting: "This cause came on this day to be heard upon the bill and exhibits, separate answers of both defendants and joint replications thereto heretofore filed, and separate replications to the said answers now here filed by leave of the court, and upon the documentary evidence and depositions of witnesses, so far as the same are free from exceptions, filed in the cause, and was argued by counsel," proceeded to decide "that the alleged payment to A. J. Conway set up in the answer of the defendant Solomon H. Chalfant was made in fraud of the complainant, and that he is not thereby barred of his relief prayed in his bill." The decree also ascertains, what is then due to the plaintiff, and refers the cause to a commissioner to ascertain what real estate is owned by the defendants, and the liens thereon and their priorities.

From this decree the defendants appealed, and here assign

as error : first, the permitting of the filing of said special replications, and second—the deciding that said judgment was not paid, and the holding of the same a lien on defendant's real estate.

The court did err in permitting said replications to be filed, because they have fallen into disuse in equity practice. If the answer discloses anything, that cannot be put properly in issue by a general replication, the plaintiff should amend his bill. (*Jackson* v. *Hall*, 21 W. Va. 601 ; *Enoch* v. *Mining & Petroleum Company*, 23 W. Va. 314.) If the defendant by way of avoidance sets up in his answer distinct matter, which is not called for by the bill, and the plaintiff wishes to have before the court all the circumstances surrounding such new matter, he should amend his bill. (*Snyder* v. *Martin*, 17 W. Va. 282.) But here by the filing of the answer there was no necessity thrown upon the plaintiff to amend his bill. The bill charged that the judgment was unpaid and was a subsisting lien upon the real estate of the defendants. The answer averred that the judgment had been fully paid by the defendant, Solomon Chalfant, to the attorney of the plaintiff, and exhibited what purported to be said attorney's receipt for nearly the amount of the judgment, which the receipt stated to be in full of said judgment. There was therefore a distinct issue raised by the answer, viz : Whether or not said judgment had wholly or in part been paid. Then it was for the parties on both sides to take evidence upon the question of payment, that is, all the circumstances attending such alleged payment ; and then it was for the court to decide on the evidence, whether the judgment was in fact paid. And it was perfectly legitimate under the pleadings for the plaintiff by his evidence to show, if he could, that there had been a fraudulent combination between the defendant Solomon H. Chalfant and A. J. Conway, the attorney of plaintiff, to defraud the plaintiff of his money. But, it is said, there was no replication to the answer. I think, while there is much in the special replications that is surplusage, yet, it seems to me, they amount to a general replication ; but it matters not, whether they do or not, for no replication was necessary as proofs were taken as if there had been. Section 4 of chapter 134 of the Code declares : " No decree shall be reversed for

want of a replication, where the defendant has taken depositions, as if there had been a replication." The defendants here took numerous depositions on the question whether the judgment was paid.

Another error is assigned in the brief by counsel for the appellants, which will here be noticed. He insists, that there was no judgment, because it was not entered as the statute requires, the judgment being for the penalty, to be discharged by a smaller sum, when the statute now requires that the damage shall be ascertained and judgment shall be given for such damages. If this were an error, as no prejudice results to the defendant therefrom, the decree would not be reversed. (*Bank* v. *Fleshman*, 22 W. Va. 317.) But if there is anything in the assignment of error to the prejudice of the defendant, it cannot be enquired into here. The question, whether or no the judgment was erroneously entered, should have been raised in that case and not in this. There certainly is a judgment, and it is just as certain that it is not *void*, although in the proper court might have been reversed, because *voidable*.

The only remaining question is one of fact: Was the judgment paid? There is no doubt of the authority of an attorney in good faith to receive payment of a judgment due his client. (*Smock* v. *Dade* 5 Rand. 639; *Wilkinson* v. *Holloway*, 7 Leigh 277; *Smith* v. *Lambert*, 7 Grat. 143; *Wiley* v. *Mahood*, 10 W. Va. 223.) It is not denied that at the time, when A. J. Conway is said to have received the payment, he was the attorney of the plaintiff, and if the money was in good faith paid to him, it was a good payment on the judgment. Of course he could not take in full discharge of the judgment anything less than the full amount due; for an attorney without authority from his client has no power to compromise a claim and take for it less than the sum due.

In this case there are exhibited some strange things, which are by no means calculated to give one more exalted views of human nature. Solomon H. Chalfant—of whom over forty witnesses say his character for truth is bad, and they would not believe him on oath, while over thirty say his character is good, or "good as far as they know," and they would believe him—tells a very strange story indeed.

He says he went to the plaintiff, Martin, in the latter-part of December, 1877, or early in January, 1878, and proposed to pay him a part of the judgment, and wanted him to give him a year's time on the balance; that Martin said he would not consent to any arrangement of that kind without the consent of his attorney, A. J. Conway; that Martin told witness to go to Conway, and any settlement or arrangement he made with Conway would be all right, and he would ratify it.   He then says that on the 18th day of March, 1878, he paid said Conway $1,895.20; that he paid him in room No. 7, in Nay's hotel in Mannington, in the county of Marion; that the money was paid a little after dark, and he took the receipt of said Conway in full of the judgment; that he drew the body of the receipt and Conway told him he had signed it, but he did not see him sign it; that he told witness he signed it when he received the money; that one day during the March term, 1878, of the court, he met Conway and Conway asked him when he could pay the Martin judgment, and witness told him he would pay it about the first of April, he thought; asked him how much it was, and he said $1,895.20; that witness then went into a law-office and wrote the receipt and took it to Mannington, and in a day or two Conway came up, and came into the drug-store where witness was staying and asked him to pay off said judgment, and said, if witness did not pay it off, he would have an execution sent to Harrison and have a levy made on John Chalfant's property.   As said Chalfant was the father of witness, he did not want that done, and being desirous of saving the commission, witness told him he would pay it off; he then asked witness what kind of a receipt he wanted; he told him he wanted a receipt covering all the law from beginning to end, and witness then handed him the receipt he had prepared, and told him to take it and copy it, and make any necessary changes and give it the correct date, and come back and he would pay him.   He took the receipt away with him and came back a little after dark, and said he was ready; they went to witness's room at the hotel, where witness paid him; he then took the receipt from his pocket and gave it to witness, stating he had signed the same receipt witness had given him, that it was as good, if not a better

receipt than he could write, that it made no difference about the date, that it would be good without a date. Witness did not see Conway afterwards. He learned that he had left the State. He admits, that about a year after this he went to Colorado to attend the taking of Conway's deposition, to be taken at the instance of plaintiff, and says, while there Conway told him that he would not give his deposition, but that he would go before two men in the town, and acknowledge that he had received the money, or acknowledge a copy of the receipt before a notary public. He asked witness which he would prefer. Witness told him he would prefer an acknowledgement of a copy of the receipt; he told witness to meet him at the office of G. G. Miner that evening at seven o'clock, and he would acknowledge a copy of the receipt, and he did so. Conway took it away, and witness does not know why he did not give it to him. Saw him the next day but had no conversation with him.

On cross-examination he said, he had an interview with Conway about the Martin judgment in January, 1878; that he wrote another receipt for the payment of said judgment in April or May, 1878, and sent it to Conway in Colorado, and requested him to sign it, but never saw it afterwards; that he got $1,200.00 of the money from his father through a bank in Fairmont, over $400.00 from Joseph E. Morgan, about $125.00 of Caleb Moore and don't remember where he got the residue; that Conway agreed with him the last of December, 1877, or first of January, 1878, that if he would pay him $800.00 and the costs of the suit he would give him a year on the balance, and when he offered to take these terms he refused, and demanded the whole and would give no time on any of it. When he came to witness on March 18, witness had the money and paid him; that he sent the second receipt to Colorado by advice of counsel.

J. B. Nay who was the security on the forth-coming bond says, that S. H. Chalfant came to him in January, 1878, and told him that he was "broke" and would like to secure witness as far as possible on the Martin claim; that the sheriff had closed his store, which witness knew, and that he was going to leave the State, that he would pay him $950.00 if he would receipt to witness in full for the claim, and wrote

a receipt for witness to sign, which witness files with his deposition; that witness concluded to do it, as he thought, he had better secure himself as far as possible, but was afterwards advised by counsel, that he was not liable for the debt, and when Chalfant applied to him again refused to accept the proposition; that Chalfant then offered him $1,200.00 which witness refused, and Chalfant then "laugingly said it don't make any difference, I can get another man to take it," and witness asked him who, and he said he had advice, that, as Conway was Martin's attorney, his receipt would be a protection against the claim.   Witness further said :   "When Mr. Chalfant first spoke to me about giving me $950.00 for the claim and taking a receipt in full, he said it was understood, that I was broke up, and if he was in my place, he would save all he could, to take the $950.00 and give him a receipt in full for the Martin claim and skip out."   *   *   *   "Some time after the first conversation we had, Sol. came to my office door, and laughingly remarked to me saying Cal. I told you I could get another party to take that claim—I can get him to take it for the amount or a little less than I offered it to you.'   I said Sol. how can A. J. take that claim for less than its face for he is the attorney and responsible.'   He remarked, 'He will do just as I told you to do get the money by——and skip out.' "   Shortly afterwards witness says he was in Mannington, and as he was passing Chalfant's drug store Chalfant called to him, showed him the receipt and said :   "I told you I could do as well as I offered you ; I have done better and here is the receipt for the same in full ;" and he also said :   "When Martin gets his money he will know it."   Witness asked why ; and he said, "Have you not heard that Jack has skipped out ?"

On cross examination witness said the last conversation was had in the latter part of March, 1878.

Robert J. Denham says, that S. H. Chalfant told him, that he had not paid the money himself to Conway but was satisfied or knew, that it had been done. He said the reason why he knew it had been done, was that the party who paid it was equally interested with himself.

The plaintiff says, that in December, 1877, after Chalfant had applied to him to permit him to pay a part and wait on

him a year for the balance, he took time to consult counsel as to the effect such an arrangement would have on the sureties, and he afterwards told Chalfant, if he would pay him $800.00 and costs of the suit and give him good security, that he would give him time on the balance, and Chalfant said he would do so, and would give J. B. Nay and his father as security. He then fixed a day for the completion of the arrangement; that he first heard of the alleged payment to Conway about the 25th of March, 1878, and soon after went to Mannington and called on Chalfant, and enquired of him, whether he had a receipt for the money from Conway. He hesitatingly replied that he had. Witness asked to see it, and Chalfant told him his counsel advised him not to show it to any one. He said he had a copy of the receipt which he produced. Witness asked him to let him see what he termed the original receipt. He said he could not do so, as his counsel had advised him not to show that receipt. Witness told him that if it was an honest transaction, he could see no good reason why he should not see the receipt. Chalfant then reluctantly said he could see it, and invited him to his room and showed it to him. Witness discovered the date and told Chalfant that looked suspicious, and he said he did not have the money when it was written.

William C. Denham says, that a short time after Conway left, Chalfant showed him the receipt, and Chalfant explained to him how it happened that it was dated when it was. He said it was understood that Conway was not to leave until after that date, but hearing that Conway was going to leave sooner, " he had sent the receipt to Conway to sign before he left, and he supposed Conway had signed it without noticing that the date was wrong."

A. N. Parish says he had a conversation with Chalfant, after Conway left, and he said he expected he knew the reason that Conway left. Witness asked him for the reason, and he said he had paid Conway the money on the Martin judgment; said he had paid him at the drug-store; said he would show witness a copy of the receipt, but witness asked to see the receipt, and he took him to his room and showed it to him, by doubling it up so he could only see the signature. Witness then asked to see the whole receipt, and when

he showed it to him, witness asked him why it was dated April 1, as that time had not come yet? He said, "that is when I am to pay the balance."

Several of these witnesses are related to Martin or Conway.

Conway's deposition was taken in Colorado upon notice given by the plaintiff. He explicitly denies executing the receipt or receiving any money, and some four witnesses beside S. H. Chalfant, say they believe the signature to the receipt is Conway's, and three say they do not believe it is, while Sands, the cashier of a bank in Fairmont, says he is not able to tell, although he has seen him write and was familiar with his hand-writing. As an expert he says there are strong points of resemblance in some of the letters in the body of the receipt, which Chalfant admits he wrote himself, and in the signature. Conway says, that in January, 1879, in Colorado, Chalfant proposed to pay him the judgment, if he would acknowledge on the back of a copy of the receipt, that it was good and save him prosecution at home ; that witness made the acknowledgment before G. G. Miner, a notary public, and held the receipt for the payment of the judgment. Chalfant refused to pay the amount and he destroyed the receipt. Chalfant by his own admission went to Colorado to be present at the taking of Conway's deposition, and he says, that, while he was there, Conway went before a notary and acknowledged the signature of the receipt to be genuine, and then kept it. Conway supplies an omission in Chalfant's deposition, or a part of it. He says that he acknowledged a falsehood, but that he was to receive the amount of the judgment as a consideration therefor.

This transaction alone would convince me of the entire lack of principle in both of these men. Both of them seem willing to do anything or swear to anything to advance their own interests. It is doubtful, taking the whole evidence together, whether Conway ever signed the receipt; but it seems to me, there is a greater probablity that he did than that he did not. But from this whole evidence I am entirely convinced, that if any money at all was paid to Conway, it was not the whole amount mentioned in the receipt, and if any money was paid to Conway, it was under a base

agreement to cheat and defraud the plaintiff of his whole claim; and this being true, the payment was not even to the amount so received a payment on the debt. While it is true that a payment made to an attorney is a good payment on his client's claim, yet such payment must by the debtor be made in good faith. If the attorney and the debtor enter into a fraudulent agreement, that the debtor will pay the attorney a part of the debt and the latter will give him a receipt for the whole, and it is understood, that the money so paid is not to be paid to the creditor but is to be kept by the attorney, the payment of money by the debtor to the attorney under such circumstances is no payment on the debt, unless the attorney pay the same to his client. Of this the surety of the principal debtor has no right to complain. As we have seen, payment to an atttorney is not payment of or on a debt, unless made in good faith; and if the payment was made to the attorney by the principal debtor under a fraudulent combination between the attorney and the debtor for the purpose of defrauding the creditor, then it can not be regarded as a payment on the debt, unless actually paid by the attorney to his client, and of course could not inure to the benefit of the surety of the principal debtor any more than it could to the debtor himself, because it is not a payment on the debt.

There is no error in the decree of the circuit court and it is therefore affirmed.

AFFIRMED.