# CHARLESTON.

DOWER *et als. v.* SEEDS *et als.*

Submitted January 27, 1886.—Decided March 31, 1886.

1. A court ought not to permit a special replication to be filed to an answer in chancery, unless affirmative relief be asked by the answer; but if there be a general replication filed to the answer, at the same time such special replication is improperly permitted to be filed, 'but no deposition or other evidence is read at the hearing, which could not have been properly read, had only the general replication to the answer been filed, and the court renders just such a decree, as it should have rendered, had no special replication been filed, the appellate court will not reverse such decree, simply because the court erroneously permitted such special replication to be filed.   (p. 128.)

2. A testator in 1868 made a will devising and bequeathing all his property to two adopted daughters.   In 1876 he executed a few days before his death another paper purporting to be his will, whereby he devised and bequeathed all his property to one of the adopted daughters saying nothing about the other, who was still living.   This last paper was probated in the county court; but subsequently the probate was annulled by a decree in chancery in a suit brought by the other adopted daughter, and this last paper was declared not to be the will of the deceaesd.   This last paper can not be relied upon by the heirs of the deceased as a revocation of the will of 1868, though they were not parties to the chancery suit, in which this last paper was declared to be null and void and inoperative as a will.   (p. 130.)

3. This will of 1868 was by the direction of the testator, given, when

he executed the last paper purporting to be a will, a few days before his death, destroyed by his wife by burning (not in the presence of the testator and most probably not till after his death). This burning of this will by the testator's direction not having been done in his presence even if done before his death could not operate as a revocation. (p. 137.)

4. A court of probate, unless forbidden to do so by a statute, may admit to probate a will, which has been lost, suppressed or destroyed; or such a will may be established by the decree of a court of chancery upon a bill brought by the devisee or legatee against the heir or distributees. In either case the order establishing the will should set forth its contents, that it was duly executed by the testator, when he was of sound mind and disposing memory, and by whom it was witnessed, and show that it was attested in the manner required by the law. The decree should also direct this order including the will so established by it to be recorded in the proper will-book, which would be done by recording a copy of the order of the probate court or a copy of the decree of the chancery court, as the case might be. (p. 139.)

5. Before a will, which has been lost, suppressed or destroyed, can be thus probated by an order of a circuit court acting as an appellate probate court upon an appeal from an order of the county court either admitting or refusing to admit such will to probate, the court must, if requested by any party interested, direct an issue of *devisavit vel non* to be tried by a jury : and so too in a chancery cause to set up such lost, suppressed or destroyed will, before a decree can be rendered setting up such will, if either party to the suit requests it, the court should direct an issue of *devisavit vel non* to be tried by a jury. (p. 157.)

6. Before such issue of *devisivat vel non* is directed either by the circuit court acting as an appellate court of probate or by a court of chancery on a bill to establish a will, which is claimed to have been lost, suppressed or destroyed, such circuit court as appellate probate court or such court of chancery, as the case may be, must first determine, that the alleged will has been destroyed, suppressed or lost, and secondly it must determine the contents of this will. And the jury on such issue are to determine, whether the will, contents of which are thus ascertained, is the last will and testament of the testator, or whether any part and, if any, what part of the contents of this last will is the true last will and testament of the testator; and when the jury shall render its verdict, it should be held conclusive, as to what was the last will and testament of the testator and as to whether any part of the will submitted to them was his last will, unless a new trial be awarded ; and the circuit court as such appellate court of probate or the court of chancery, as the case may be, should set up and establish in the manner before stated the will as found by

by the jury as the last will and testament of the testator and have it recorded as such in the manner before indicated, or should refuse to establish any part of the will, which was submitted to the jury, as the will of the testator, if the verdict of the jury requires such order or decree.   (p. 157.)

*D. S. Hounshell* for appellants.

*J. W. English, C. E. Hogg* and *J. B. Menager* for appellees.

Statement of the case by GREEN, JUDGE:

John J. Weaver was married Dec. 29, 1829, and lived with his wife till his death, July 15, 1876. He never had any children by her, but after he had been married some twenty years, he had habitual intercourse with one Anna Maria Weaver. In 1850, while such illicit intercourse existed, she had a daughter, Anna Eliza, who afterwards married George Church. There was some uncertainty as to her paternity, Weaver not believing her to be his child, but when not more than six months old she was taken to his home and there reared by him and his wife, till she was seventeen years old, when she married. About a year after the birth of Anna Eliza Anna Maria Weaver gave birth to another daughter, Maria Theresa. She was born at Weaver's house and was admitted by him to be his child; but she never lived there but lived with her mother and married with her father's approval Patrick Dower, the marriage taking place about the time her sister was married. Shortly afterwards, in the autumn of 1868, Weaver, who owned a large amount of real and personal property, made his will, whereby after the payment of his just debts and funeral expenses he devised and bequeathed all his estate both real and personal to his wife, Angelina Weaver, for and during her natural life and after her death to Theresa Dower and Anna Eliza Church and their heirs forever in equal moieties appointing his wife Angelina Weaver his executrix with the provision, that she should not be required to give any bond as such executrix. This will was executed by John J. Weaver, he being of sound mind and memory, and published as his last will and testament, he subscribing his name thereto in the presence of Richard Spencer and William Dilcher, who subscribed their names as

witnesses thereto at his request in his presence and in the presence of each other.    The wife of the testator, Angelina Weaver, knew the contents of this will and never was satisfied with it .    She was unwilling that Theresa Dower should have any portion of her husband's estate, but desired that after her death the whole estate of her husband real and personal should go to Anna Eliza Church, who had been raised by her.    But Weaver, the testator, seemed satisfied with it and frequently so said to others.    These declarations were made by him from time to time up to as late as January 5, 1876, ten days before his death, and were then made, while he was dangerously ill, confined to his bed afflicted with a cancer in the stomach, of which he died.

Four days after he thus declared himself satisfied with this will, which he had made in 1868, he made another will upon January 9, 1876, which was a Saturday, whereby he devised and bequeathed all his property real and personal to his wife for life, remainder in fee to Anna Eliza Church the wife of George Church, and her children, making no mention of Maria Theresa Dower, his illegitimate daughter. This last will was admitted to probate by the county court of Mason on January 24, 1876, it having been presented by the executrix, Angelina Weaver, and proven by the attesting witnesses J. C. Brinker, a nephew of the testator, and L. H. Bridgeman, who also wrote the will.

Theresa Dower and her husband Patrick Dower insisted that the testator, when he made this last will, was incompetent to make a will, his mind being then affected by the large quantity of morphine, which for several days the physicians had administered to him to relieve the intense pain he was suffering, and that he was also unduly influenced by his wife and while in this state of mind induced by her to change his will and to give all his property after her death to Anna Eliza Church and her children to the exclusion of Theresa Dower.    On May 26, 1877, she, her husband and their infant children brought a suit in chancery in the circuit court of Mason county, making defendants Anna Eliza Church and her husband George Church and Angelina Seeds, late Angelina Weaver, she having married James M. Seeds, and her then husband, James M. Seeds, and the four infant children of

Anna Eliza Church and George Church. The object of this suit was to have the paper dated January 9, 1876, which had been admitted to probate as the will of John J. Weaver, declared not to be his will, and the probate thereof annulled. And the bill also asked, that the will made in 1868 might be set up and established as the last will and testament of John J. Weaver, and alleged that it was lost or destroyed.

On October 16, 1877, after answers were filed to this bill and some depositions taken, the court at the instance of the plaintiffs decreed, "that an issue be tried before a jury at the bar of this court to ascertain, whether any, and if any, how much of the paper probated by the county court of Mason county, West Virginia, on January 24, 1876, was the will of John J. Weaver, deceased." On October 16, 1879, the jury on the trial of this issue rendered a verdict, "that the paper-writing purporting to be the last will of John J. Weaver, deceased, and probated in the county court of Mason county, West Virginia, on January 24, 1876, was not nor was any part thereof the will of John J. Weaver, deceased." The defendants asked a new trial of this issue on the ground of newly discovered evidence, the misconduct of a juror, and that the verdict of the jury was contrary to the law and evidence, and further that illegal and incompetent evidence was allowed to go to the jury. But the court overruled the motion; and a bill of exceptions was taken, in which all the evidence was certified, as is substantially given in 21 W. Va. 36 to 42. The defendants on October 28, 1877, also moved the court to set aside the order directing the issue as improperly and improvidently awarded, which the court refused to do; and on November 1, 1879, entered a decree in pursuance of said verdict and decreed, that the paper-writing purporting to be the last will and testament of John J. Weaver, deceased, and probated in the county court of Mason county, West Virginia, on January 24, 1876, was not and is not nor is any part thereof the will of John J. Weaver, deceased; and the said order probating said will was set aside, annulled and held for naught. From this decree the defendants appealed to this Court and the cause was decided on December 2, 1883. The full statement of the case with the opinion of the Court and our decision is to be found in 21 W. Va. 23.

Our conclusion was as follows (p. 61 *et seq.*):

"The facts, as we have stated them, do show, that the attending physician of J. J. Weaver, as well as the attesting witness and some of the parties who had the opportunity to judge, all testified to the competency of the testator; and the attesting witnesses and some others testify to facts, which seem clearly to show, that he was, when he made the will in controversy, of sound mind and disposing memory. But on the other hand a large number of witnesses who saw him but a short time either before or after this will was made including the consulting physician, testify to facts in reference to his condition, which seem to be irreconcilable with the testimony of the defendants in this case, to which I have referred. The jury could scarcely believe the statements of many of these witnesses, and yet believe the attesting witnesses and others had fairly detailed to them the facts and occurences, which they say occurred just before or just after the will was executed. This conflicting evidence the jury could not reconcile. They concluded the testimony which tended to show the incompetency of the testator, was entitled to the most weight strengthened as it was by the fact, that the testator when in perfectly sound mind and disposing memory, had some eight years before made a will, whereby after his wife's death he gave half of his large estate to Theresa Dower, whom he acknowledged to be his child; and he repeatedly and up to within a few days of the time when it is claimed he executed this last will, declared himself satisfied with his former disposition of his property and would not change it. The jury too upon the evidence may well have supposed, that undue and improper influence may have been brought to bear to obtain the execution of the last will. And though we might think the evidence on this point, not very strong, still it was with the jury to judge of its weight. Had they found a verdict for the will the court could not with propriety have set aside the verdict. For there was much evidence, as we have seen, to show that the intestate was unquestionably competent to make a will; and it was further shown, that he had frequently said he would give Theresa Dower nothing, because her husband against his wishes had engaged in selling whisky as a business. * * * *"

"Our conclusion therefore is that the decree of November 1st, 1879, is not erroneous, in so far as the court expressed the opinion, that the plaintiffs were entitled to the relief prayed for, and so far as they ask the setting aside of the paper writing purporting to be the last will and testament of John J. Weaver, deceased probated by the county court of Mason county on the 24th of January, 1876 ; and so far as it adjudged, that it was not and is not, nor was nor is any part of the will of John J. Weaver, deceased ; and so far as it set aside and annulled said order probating said paper as the last will and testament of John J. Weaver. "But after doing this the court proceeded at the request of the plaintiffs, in order to give them an opportunity in this suit of setting up and establishing the will, alleged in their bill to have been made and published in 1868, and alleged to have been lost or destroyed, to remand this cause to rules, with leave to the plaintiffs, to amend their bill, by making the heirs of John J. Weaver, defendants thereto, and with leave to have the process issued and served upon them to answer said amended bill.

"This decree must therefore be amended by this Court, by striking out this portion of it, and in lieu thereof adjudging that the defendants in the court below pay to the plaintiffs in the court below their costs in the circuit court expended and providing, that this decree shall in no manner prejudice the plaintiffs or any of them in any suit or proceeding of any sort, which they may be advised to institute to have the will alleged to be executed in 1868 either probated or established in a court of equity. And this decree being thus corrected must be affirmed by this Court and the appellees must recover of the appellants their costs in this Court expended and $30.00 damages."

In July, 1883, Theresa Dower and Patrick Dower, her husband, and Ann Eliza Church and George Church, her husband, instituted this suit in the circuit court of Mason county and filed their bill against Angelina Seeds and James M. Seeds, her husband, Alonzo Weaver and twenty-six others named, heirs of John J. Weaver, and also against the unknown heirs-at-law of John J. Weaver, to set up and establish this will executed in 1868.

The bill was inartistically drawn and somewhat imperfect. It set out simply, that John J. Weaver, a farmer of Mason county, West Virginia, died in January, 1876, after having made and published his last will and testament dated in 1868; and that he died without lawful issue; and that this will was in January, 1876, a few days after his death destroyed by burning; and that it was destroyed thus out of the presence of the testator without his direction, and when the testator was incompetent to make a will. The bill then states the contents of of this destroyed will, substantially as we have hereinbefore stated it; and that it was attested, as we have before stated, and that the defendants are heirs-at-law of John J. Weaver. It concludes with this prayer, "that by a proper decree of the court the contents of said will of John J. Weaver, deceased, executed by him in 1868, and which was destroyed by burning as foresaid, may be set up, declared and established as the last will and testament of John J. Weaver, deceased, and that they may have all such other, further and general relief as in equity and good conscience seemeth meet." The bill was afterwards amended by making some twelve other named persons, heirs of John J. Weaver, defendants.

This bill was answered by Elizabeth Stone and John S. Stone, her husband, and by six other of the defendants at. August rules, 1883, and afterwards by Joseph McKinley and Adley McKinley. These answers are substantially alike, and their contents may be stated together. They admit the death of John J. Weaver but deny, that before his death he published his last will, but aver that on the contrary he left no valid will and died without lawful issue, and that the defendants, who answer, are his heirs as well as others named as defendants in the bill and amended bill and certain others also, whose names and residence are unknown. They say they know nothing of the destruction by burning or otherwise in January, 1876, or at any other time of any paper purporting to be the last will and testament of John J. Weaver, deceased; but some of them admit, that they have been informed, that such a will was burnt shortly before his death by his direction; but they all deny any knowledge of either the existence or contents of such paper purporting to be the last will of John J. Weaver, and say that, if any such

will was executed, it was revoked, as hereinafter mentioned, and destroyed as aforesaid by the direction of John J. Weaver. They further say, that, if John J. Weaver did make a will, as alleged in the bill, in 1868, which latter will was duly proven and admitted to record in the county court of Mason county and probate thereof granted in due form on January 24, 1876, and his widow, Angelina Weaver, qualified as his executrix, filing as an exhibit a certified copy of the order admitting this will dated January 9, 1876, to probate. This will by disposing of the real and personal estate of John J. Weaver in a different manner from the will of 1868 as stated in the bill necessarily revoked the same.

To these answers general replications were filed.

W. R. Gunn was duly elected and qualified to sit as a special judge in the cause on April 26, 1884, it being a cause in which the judge of said court could not properly sit. Said special judge against the objection of the defendants allowed a special replication to be filed by the plaintiffs to said answer. This special replication says: "That they deny, that said paper-writing dated on January 9, 1876, and probated on January 24, 1876, revoked said will of John J. Weaver deceased made in 1868, because suit was brought in the circuit court of said Mason county on the chancery side thereof to set aside and declare void said paper-writing made on January 9, 1876, in which Theresa Dower et al, were plaintiffs and Anna Eliza Church et al., were defendants, and a decree was duly entered in said cause on November 9, 1879, declaring that no part of said paper-writing made on January 9, 1876, was or is the last will and testament of John J. Weaver, deceased, and declaring the probate thereof obtained on January 24, 1876, null and void and of no effect, which decree was afterwards affirmed by the Supreme Court of Appeals of West Virginia; all of which will more fully and at large appear by reference to the papers, orders and decrees in said cause now on file with the clerk of this court, to which reference is here made, and which replicant asks may be read and treated as a part of this replication."

To this special replication the defendant, who had answered, rejoined as follows:

"These defendants, for rejoinder, come and jointly and severally say that they know nothing about the suit brought in the circuit court of Mason county, in which plaintiffs in their special replication say the will made by J. J. Weaver, deceased, on January 9, 1876, was declared null and void, except so far as it appears from the records of the court; but they now aver that they, these defendants, were not, *now* was either of them, parties to said suit, and so had no opportunity to protect their interests therein and are not bound in any order made in said suit. These defendants also rejoin generally to said special replication. And now, having fully answered said special replication, these defendants pray as they have already prayed in their answer to the bill. And as in duty bound, they will ever pray, &c."

To this rejoinder the plaintiff excepted as follows :

"The plaintiffs, by their attorney, except to so much of the within rejoinder as recites that the defendants therein named were not parties to the proceeding by which the paper-writing set out and described in their special replication was set aside and annulled, and ask that that part of the within rejoinder be striken *out* as immaterial for the purpose of this cause."

The court by an order made May 6th, 1884, permitted this rejoinder to be filed but sustained the plaintiff's exception thereto ; and that part of said rejoinder, to which said exception relates, was ordered to be stricken out. The plaintiff took the deposition of Richard Spence, who proved, that in 1868 Creed Morris wrote a will for John J. Weaver, whereby Weaver left all of his property to his wife during life ; and after her death the property was to be equally divided between his two adopted daughters Anna Eliza Church and Theresa Dower ; that this will also provided, that his wife was to be executrix ; that the will was signed by John J. Weaver after having been read to him ; that it was signed in the presence of William Dilcher and Richard Spence as witnesses to the will, who in the presence of the testator and at his request and in the presence of each other signed their names as witnesses ; that he signed it also in the presence of Creed Morris, who wrote the will and read it to him ; and that his mind was then perfectly sound and clear.

The same facts were proven by Creed T. Morris, a witness for the plaintiff, who further states, that this will provided, that no security should be required of Angelina Weaver as executrix.

Charles E. Hogg, a witness for the plaintiff, proved that William Dilcher, the other subscribing witness to the will, was dead, and that on March 28th, 1878, acting as attorney for the plaintiff in the chancery suit before referred to of Theresa Dower *et al.* v. Anna Eliza Church *et al.* he took the deposition of William Dilcher, who testified, that he was an attesting witness to said will made in 1868 and that John J. Weaver, the testator, had told him, Hogg the witness, that Dilcher was a witness to his will.

Angelina Seeds, a witness for the plaintiff, proved, that John J. Weaver died on January 15, 1876; that she knew that said Weaver made his will in 1868; that she had read this will and had the custody of it. She states the contents of this will, just as the other witnesses stated them, but says nothing about her having been appointed executrix. She states too, that Weaver was of sound mind and disposing memory, when he made this will; that she had lived with him as his wife since 1829; that he died on Saturday, January 15, 1876; and that she burned this will of 1868 on the Tuesday following his death. In her deposition in the suit before referred to of Theresa Dower *et al v.* Anna Eliza Church *and others*, she testified, that she burned this will made in 1868, on Tuesday after her husband John J. Weaver made his will of January 9, 1876, which would have been the Tuesday before instead of the Tuesday after his death. In both depositions she states, that she was directed to burn it by her husband on the day he made his last will, which was set aside, that is, on January 9, 1876; and that no one was present, when she burned it. In her deposition in this cause she says positively that she did not burn the will until after her husband's death, and that if she said Tuesday morning following in her deposition in the other chancery cause, she meant Tuesday morning following his death. She thought he might get well; and if he did, she wanted him to burn it himself; she felt a delicacy about burning it. Her husband never asked her, and she never said anything to him about

the burning of this will, after he on January 9, 1876, directed her to burn it. What she said in her deposition in the former suit about burning the will of 1868 was, that on January 9, 1876, when this second will was made, she said to him: "What are you going to do with the other one?" He said "Burn it up, burn it up;" and she did so. On cross-examination, it being assumed, that by this she meant, she burned it up at once on January 9, 1876, she said "no, she did not burn it that day." Then she was asked: "State when you did destroy it?" She answered: "As near as I can recollect on the Tuesday morning following. I was looking over some papers and saw it and was sitting by the stove, and I put the will in the stove." She proved, as she did in her deposition in the former suit, that he was of sound mind and disposing memory on January 9, 1876, when he made his last will, and when he directed her to burn the will of 1868. She was asked, if she had not told several persons, that she had burned this will prior to the death of her husband. She denied that she ever told any of them so; and none of them were examined as witnesses.

This being all the evidence in the cause, the court on May 10, 1884, entered the following decree:

"This cause came on this day to be heard before W. R. Gunn, heretofore selected as special judge to try and determine the same, upon the bill, and upon the process duly executed upon the home defendants, and upon the order of publication duly published and duly posted as to non-resident defendants, and upon the proceedings regularly had at the rules upon said bill, and upon the joint and several answers of Elizabeth Stone and J. S. Stone, her husband, Charles Weaver, Henry Weaver, G. B. Rayburn, Cassie Sayre, Cassie Rayburn and Jake Brinker, and the separate answer of Joseph McKinley, and the special replication of plaintiffs to said answer, and also upon the general replication thereto, and also upon the joint and several rejoinders thereto of Elizabeth Stone and J. S. Stone, her husband, Charles Weaver, Henry Weaver, G. B. Rayburn, Cassie Sayre, Cassie Rayburn and Jake Brinker, and upon the record of the cause, including all papers, orders and decrees therein of Theresa Dower and others against Anna Eliza Church and others lately

pending in this court, and also upon the depositions duly taken and filed in this cause, and upon the former proceedings had thereon, and was argued by counsel; upon the consideration of all which, the court is opinion and doth find that the John J. Weaver mentioned in plaintiffs' bill did make a writing some time in the year 1868, purporting to be his will, whereby the said John J. Weaver purports to have devised all of his estate, both real and personal, charged with the payment of all his just debts, for and during her natural life, to his then wife, Angelina Weaver, now Angelina Seeds, with remainder as follows: One moiety to the plaintiff, Anna Eliza Church, and her heirs, and the other moity to the plaintiff, Theresa Dower, and her heirs, said writing appointing and naming the said Angelina Weaver, now Angelina Seeds, sole executrix thereof, without bond, and the above named defendants requiring it, it is adjudged, ordered and decreed that an issue be and the same is hereby directed to be made up and tried at the bar of this court to ascertain and try whether any, and if any, how much of the paper-writing so found to have been made by said John J. Weaver in the year 1868, be the will of said John J. Weaver, deceased, and upon the trial of said issue, it is ordered that the pleadings in the cause may be read to the jury, as well as the depositions of all witnesses taken in this cause who can not attend and whose attendance can not be procured, and on the trial of said issue the said plaintiffs are to maintain the affirmative and the defendants the negative.

"Memorandum.—Be it remembered that those defendants who appeared and answered objected to so much of the foregoing order as finds that the said John J. Weaver mentioned in the plaintiff's bill did make a writing some time in the year 1868, purporting to be his will, and ascertaining its contents and provisions; and also objected to it because it does not present the full issue they asked, and for error apparent upon the face of said order, which objections were overruled; to which ruling said defendants except."

On May 8, 1885, the court entered the following final decree:

"This day Hon. F. A. Guthrie, the judge of this court, vacated the bench because of being disqualified from sitting

in this cause, and thereupon Hon. W. R. Gunn, a practicing attorney of this court, heretofore duly elected a special judge to try and determine the matters in controversy in this suit, again went upon the bench. And now, this cause coming on to be finally heard upon the former orders and decrees herein made and entered, upon the process duly served upon the home defendants, and the order of publication duly executed as to the non-resident defendants and the unknown heirs-at-law of John J. Weaver, deceased, the orders and proceedings duly had at rules, upon the bill and amended bill, the separate answer of Adley McKinley, and the general replication thereto, the joint and several answers of Elizabeth Stone and John S. Stone, her husband, Charles Weaver, Henry Weaver, G. B. Rayburn, Cassie Sayre, Cassie Rayburn and Jake Brinker, and the plaintiffs' replication in writing thereto, the separate answer of Jos. McKinley and general replication thereto, the joint and several rejoinder of Elizabeth Stone and J. S. Stone, her husband, Charles Weaver, Henry Weaver, G. B. Rayburn, Cassie Sayre, Cassie Rayburn and Jake Brinker to the replication in writing of the plaintiffs, upon the bill taken for confessed and set for hearing as to all the home defendants failing to plead, answer or demur to the bill or amended bill of complainants, upon the depositions taken and filed in the cause, upon the plaintiffs' suggestion of the death of the defendant, James M. Seeds, and they asking that the suit abate as to him, and the said suit is hereby abated as to him, the said James M. Seeds, and neither the plaintiffs or defendants asking an issue to be directed in this cause, but submitted the decision of all matters arising upon the record to the court, after argument of counsel for both plaintiffs and defendants and a careful examination of the papers in the cause, the court is of opinion and doth so adjudge, order and decree that in the year 1868, as set out in the plaintiffs' original bill, the decedent, John J. Weaver, being of sound mind and memory, did make and publish his last will and testament in writing, to which he subscribed his name as and for his last will and testament in the presence of Richard Spence and William Dilcher, the said Richard Spence and William Dilcher also subscribing their names to said writing as witnesses thereto at the request of said John

J. Weaver, deceased, in his (the said testator's) presence, and they, the said witnesses, subscribing their names thereto as witnesses in the presence of each other, and that said last will and testament was in existence at the time of the death of said testator.

"And the court doth further find that since the death of said testator, said John J. Weaver, that said last will and testament so made in writing and published by him as hereinbefore ascertained and adjudged, has been destroyed by burning, and that its contents can only be established by parol evidence, and the plaintiffs so desiring it, the court doth find from the pleadings and proofs in this cause, and doth so order, adjudge and decree, that the said will doth contain the following devises and bequests and none others.

"First. After the payment of all the testators's just debts and funeral expenses, he, the said John J. Weaver, by said last will and testament, devised and bequeathed all his estate, both real and personal, to his wife Angelina Weaver for and during her natural life.

"Second. After the death of his wife Angelina Weaver, he, the said John J. Weaver, by said last will and testament, devised and bequeathed all the remainder of his estate, both real and personal, to the plaintiffs, Theresa Dower and Ann Eliza Church, and their heirs forever, in equal moities, viz.: one half of said remainder after the termination of the life estate of said Angelina Weaver to said Theresa Dower and her heirs forever, and the other one half of said remainder after the termination of the life estate of said Angelina Weaver to the said Ann Eliza Church and her heirs forever.

"Third. And the said testator, the said John J. Weaver, nominated by his said last will and testament the said Angelina Weaver as his executrix, desiring that she be not required to give any bond in qualifying as such executrix.

"And the court doth adjudge, order and decree that a certified copy of this decree be made out by the clerk of this court and by him transmitted to the clerk of the county court of this county to be by him, the said clerk of the county court, duly recorded as and for the last will and *testator* of said John J. Weaver, deceased, with leave to the proper person to qualify thereunder as the personal representative of

said testator. And it is further adjudged, ordered and decreed that the plaintiffs do recover of the defendants their costs in this behalf expended, including a statute fee of $20.00 (twenty dollars), and leave is hereby given to sue out execution therefor if they or any of them may so elect.

"And the defendants desiring to appeal from this decree, it is ordered that the same be suspended for sixty days from the rising of this court; but this order of suspension is to be of no effect until the defendants, or some one of them, shall enter into bond with good security before the clerk of this court, in the penalty of $500.00 (five hundred dollars), conditioned to pay all costs and damages that may be sustained by any one by reason of the suspension of this decree should no appeal and *supersedeas* be allowed thereto by the Supreme Court of Appeals of this State within the time aforesaid."

The defendants moved the court to exclude the deposition of Angelina Seeds, which the court refused to do, but declined to consider so much of it, as relates to communications had between her and her husband, John J. Weaver.

From this decree the defendants, the heirs of John J. Weaver, obtained an appeal and *supersedeas*.

Opinion by GREEN, JUDGE:

Before considering this cause on its merits we must first dispose of several formal objections to the manner, in which it is presented to this Court. It is assigned as an error in the court below, that it permitted the filing of the special replication to the answers of the defendants. As no affirmative relief was sought by the answers, it was obviously improper for the court to permit a special replication to be filed. This has been repeatedly decided by this Court (*Enoch* v. *Mining Co.*, 23 W. Va. 314; *Chalfants* v. *Martin*, 25 W. Va. 394). As all the matters set forth in this special replication were perfectly well known to the plaintiff, when the original bill was filed, it was obviously the duty of the plaintiffs, if they desired these matters to appear in the pleadings, to set them out in the original bill. The cases above referred to show this distinctly. The plaintiffs having failed to do this, after their answers had been filed, if they desired to introduce these matters into their pleadings, they should have asked

the court to permit them to do so by an amended bill which the court ought to have allowed, and it ought not to have permitted the filing of a special replication to bring such new matter into the pleadings. But it will not necesarily follow, that the decree of the court appealed from must be reversed for this error of the court. To justify us in reversing the decree for this cause, it must appear, that the defendants were thereby prejudiced.

In this case a general replication was filed to all the answers as well as this special replication. All the evidence, which was introduced under the pleadings in this cause including special replication and a rejoinder thereto, could have been properly introduced under the general replications. The answers claim, that the will of 1868, which the bill sought to set up and establish, was revoked by the fact, that the testator made a subsequent will on January 9, 1876, which was duly probated on March 24, 1876, by an order made by the county court of Mason. This special replication sets out, that the order probating this will of January 9, 1876, was declared null and void in a certain chancery-suit in the circuit court of Mason county brought to set aside said will and the said order probating it. Now that this order of the county court of Mason probating this will of January 9, 1876, was subsequently set aside and annulled could as well have been proven under the issue made by the general replications to this answer as under the issue made by the special replication and rejoinder; for when this order of January 24, 1876, of the county court of Mason was declared null and void, and the paper dated January 9, 1876, purporting to be the last will and testament of John J. Weaver, was declared not to be and no part of it ever to have been his will, then this order not only was inoperative from that time, but in law it was the same thing precisely, as if no such will as that of date January 9, 1876, had ever been executed, and no such order as that of the county court of Mason of January 24, 1876, probating it had ever been made. So that a denial by the general replication, that such a will had ever been made or probated, was proven, when under the general replication it was proven, that this order had been set aside and annulled and said paper declared not to be the will of John J. Weaver. The defendants in

the court below therefore were not injured by the error of the court in improperly permitting the filing of the special replication and rejoinder.

The court below ought to have decided, whether the demurrers to the plaintiff's bill were good.   If it had done so, the real question involved in this cause would have been presented in the simplest possible form.   Its failure to do so has caused this question to be presented in a much more confused manner.   Nevertheless, if upon the demurrer the court should have decided the bill to be good, the defendants can not have been injured by the failure of the court to act upon these demurrers.   The court by deciding the case on the final hearing in favor of the plaintiff thereby decided, that the bill was such, that the plaintiffs had a right to ask relief of a court of equity.   The evidence in the cause establishes beyond doubt, that John J. Weaver did make a will in 1868, and that it was signed by him in the presence of two witnesses, who at his request and in his presence and in the presence of each other signed said will as subscribing witnesses, and that he was then of sound mind and disposing memory; and the contents of this will were distinctly and clearly proven.   If this will had been still in existence, without doubt it ought to have been probated upon the evidence of the witnesses of the plaintiff in the court below, unless it had been revoked by the testator since it was executed (Code, ch. 77, sec. 3 p. 479; Warth's Amended Code p. 569).

Our Code provides how a will may be revoked.   (Code, ch. 77 secs. 6 and 7 p. 480; Warth's Amended Code p. 568). The sixth section provides, that the testator's marriage shall operate as a revocation of his will, except when the will is but the exercise of an appointment of another's estate.   Section 7 is as follows:

"No will or codicil or any part thereof shall be revoked, unless under the preceding section, or by a subsequent will or codicil, or by some writing declaring an intention to revoke the same, and executed in the manner in which a will is required to be executed, or by the testator. or some person in his presence and by his direction, cutting, tearing, burning, obliterating, cancelling, or destroying the same, or the signature thereto, with intent to revoke."

This is a change from what was formerly the law in some important particulars. Formerly a testament or will of personal property could be revoked by a writing not signed by the testator or subscribed by any witnesses. (*Glasscock* v. *Smithers, &c.*, 1 Call 499; and in accord with this the Rev. Code of 1819, Vol. 1 ch. 104 sec. 9, p. 377 which was the statute-law in force at least as early as 1785).

The Code of 1785 ch. 61 secs. 6, 7 and 8 provided as follows : "No will in writing or any devise therein of chattels shall be revoked by a subsequent will, codicil or declaration, unless the same be in writing."

In *Barksdale* v. *Barksdale*, 12 Leigh 540 *et seq.*, Judge Baldwin speaking of this sec. 9 of ch. 104 of Rev. Code of 1819 says : "There are two modes of written revocation contemplated by this sec. 9, one by a will or codicil in writing, the other by a declaration in writing. For the sake of distinction, the first may be called a testamentary revocation, and the last a declaratory revocation. It is true, the declaratory revocation may assume the shape of a last will and testament; for that is a mere matter of form, if the paper be not also testamentary in its nature. The distinction between the two modes of revocation is not formal, but essential. In the testamentary revocation, the testator contemplates a new disposition of his property, and the revocation may be implied from inconsistency in the provisions of the two instruments, in which case it is a matter of comparison and construction ; or it may be express, in order that the testator may do his new testamentary work without being in any wise fettered by the contents of his former will. The declaratory revocation on the other hand, is always express, is not a matter of comparison and construction, and is in contemplation by the testator of that disposition of his property made by the law governing in cases of intestacy.

"In every testamentary revocation, the testator always acts upon the supposition that his whole purpose will be accomplished, and his entire testamentary act will be effectual, as well in regard to the new disposition of the subject as the revocation of that which he had made by the former instrument ; and that revocation is in fact part and parcel of his new testamentary action. This is manifestly true in relation

to implied testamentary revocations; and if not so obviously, it is to my mind equally true, in relation those which are express. That the testator should ever proceed upon the hypothesis of the invalidity of the instrument which he employs to effectuate his object, is beyond my conception; nor can I conceive, where he makes a new disposition of his property, and *eodem flatu* a revocation of a former disposition of it, how he can do so with any other expectation than that both will share the same fate. It seems to me necessarily to follow, that the invalidity of the instrument, which defeats the new disposition of his property must also defeat the revocation of the former instrument.

"It has been argued, however, with great ingenuity and force by the appellant's counsel that the statute does not require that an express revocation must necessarily be by last will and testament; that any written declaration is sufficient for the purpose; that here we have such a declaration, and though we find it in a paper intended to operate as a last will and testament, which is nugatory as such, not having been written altogether by the testator, nor attested by two witnesses, yet that still it is a declaration in writing, which is all the statute requires, and as such is unquestionable on the score of validity. All this I admit, upon the supposition of its having been shown that the revocation contemplated by the testator was not a subsidiary conditional exercise of power, but an independent, substantive act, without reference to the character of the instrument employed, and unaffected by the new disposition thereby made of his estate. But this in my opinion has not been shown; and it seems to me in the nature of things can not be shown. How can we know, that the testator contemplated the revocation as effectual, though the testament itself should be unaccomplished? How could such an expectation exist, without a probability, in his mind, that his testament would prove abortive? And who ever made his last will and testament under the influence of such a belief?

"In a case like this no argument to prove the revocation, substantive and independent, can to my apprehension avail anything, unless it goes the length of proving, that the testator intended to die intestate, which is impossible here, it

being directly in the teeth of the testamentary provision of the instrument. * * * * How can an argument in support of the validity of a part of it only, be derived from the testator's supposed intention as disclosed by other parts wholly invalid? Surely no change of intention on the part of the testator can be inferred from testamentary provisions of a will which is void because not executed in the manner prescribed by law. (Rob. on Wills, 211, 212)."

All the other judges concurred in the views of Judge Baldwin.

His reasoning above is obviously even more applicable to our statute-law above quoted, sec. 7 of ch. 77 of Code of W. Va., than it was to sec. 9 of ch. 104, of 1 Rev. Code of 1819. Our statute above quoted even more obviously than this sec. 9 of ch. 104 of Code of 1819 contemplates these two modes of written revocation of a will, the testamentary and the declaratory revocation. And it is to my mind impossible to show that the testator by his will made January 9, 1876, could have contemplated the revocation of his will of 1868, even had there been in the last a clause revoking said will, except upon the condition that his last will of January 9, 1876, should be carried out and accomplished. If this will of January 9, 1876 was pronounced inoperative and void for any reason, any clause in it revoking the will of 1868 would necessairly be void also. But this is, if possible, still more apparent, when there was no express clause in the will of 1876 revoking the will of 1868, and the revocation is only implied from the fact that the two wills are inconsistent. If the last will had been operative, it would have impliedly revoked the first, as it was impossible that Anna Eliza Church and her children should have all the testator's property after the death of his widow, as the will of January 9, 1876 provided, and that all the testator's property should go to Anna Eliza Church and Theresa Dower to be equally devided between them after the death of the widow, as the will of 1868 provided. But if the will of 1876 is inoperative and void, then it of course can not impliedly revoke the will of 1868.

The appellant's counsel is thus forced to contend, that this will of 1876 is not inoperative and void, because it was pro-

bated by the county court of Mason and pronounced valid and the last will and testament of John J. Weaver by the order of said county court. But it is expressly provided by sec. 28 of ch. 77 of the Code, that "after such sentence or order is made, a person interested, who was not a party to the proceeding, may within five years proceed by bill in equity to impeach the will, on which bill, if required by either party, a trial by jury shall be ordered to ascertain whether any or, if any, how much of what was so affirmed for probate be the will of the decedent." This the record shows was done by Theresa Dower and others; and this paper of date January 9, 1876, purporting to be the will of John J. Weaver was and every part of it was declared not to be his will and inoperative and void.

But it is claimed, that, as the appellants the heirs of John J. Weaver, were not parties to this chancery-suit, it is not binding on them, and that this order of the county court of Mason county made January 24, 1869, is still in force, so far as these heirs are concerned. If this was so, they could have no standing in this Court; for, if this order was valid and binding, it would establish, that they had no sort of interest in the disposition of the estate of John J. Weaver, and however wrongful the decree of the court below establishing the will of 1868 might be, it could do these heirs of John J. Weaver no injury, as they certainly would have no interest in the estate, if this order of the county court of Mason of January 24, 1876, probating the will of January 9, 1876, be valid. But so far from being valid this paper dated January 9, 1876, purporting to be the last will and testament has been authoritatively declared not to be his will; and this order of the county court of Mason of January 24, 1876, has been declared void by the decree of the circuit court of Mason county in the chancery-suit brought for that purpose under said statute, and this Court has affirmed this decree of the circuit court of Mason and declared, that the effect of this decree was to render this paper dated January 9, 1876, purporting to be the will of John J. Weaver inoperative as his will, it being a judgment *in rem*, it rendered this paper-writing inoperative and void as the will of John J. Weaver as to the whole world, and, so far as this effect was concerned, it was

immaterial, who were before the court, when such decree was rendered. If any one was injured by it, who ought to have been a party to this chancery-cause but was not, he would still have been bound by this decree until set aside by a bill in the nature of a bill of review filed by those persons, who ought to have been but were not made parties to this chancery suit. (*Dower* v. *Church*, 21 W. Va. 53).

The result of this is, that this case is legally precisely what it would have been, had this paper purporting to be the will of John J. Weaver of date January 9, 1876 never been executed, and this would of course have left in operation the will of John J. Weaver made in 1868, it having been duly executed, when he was of sound mind and disposing memory, and witnessed in the manner in which the law requires a will to be executed and witnessed, unless after its execution it was cancelled in a legal manner by burning or in some other mode prescribed by our statute.

It is not contended that this will of 1868 was ever revoked except by the paper purporting to be the will of John J. Weaver dated January 9, 1876, or by the burning of it by the wife of Weaver at his direction either just before or just after his death. It was not revoked by this pretended will of January 9, 1876, we have seen. Was it revoked by this burning? It would seem most obvious, that it was not, for our statute on its very face declares how a will may be revoked in this mode, and the evidence clearly shows, that the mode prescribed by the statute was not followed in this case. The statute, ch. 77 secs. 6 and 7, declares, that a will may be revoked by the subsequent marriage of the testator or by a subsequent will or codicil or by some writing executed, as a will must be executed, or by some person in his presence and by his direction, cutting, tearing, burning, obliterating, cancelling, or destroying the same or the signature thereto, with the intent to revoke." This or similar acts have been construed in Virginia and in England. This was done in *Mahone's Adm'r et al.* v. *Hobbs et al.*, 1 Rob. 379, decided in 1842, when the statute-law as contained in ch. 104 of 1 Rev. Code of 1819 with reference to the revocation of devises in a will was in force, that portion of it bearing on the question now before us being in the following words:

"No devise or any clause thereof, shall be revocable, but by the testator or testatrix destroying, canceling or obliterating the same or causing it to be done in his or her presence or by a subsequent will, codicil or declaration in writing made as aforesaid." From this it will be perceived, that the mode of revoking devises remains unchanged, and that the only change, which has been made, is to put the mode of revoking as well as the making of wills bequeathing personalty on the same footing as the wills devising land; and this was partially done in effect by the statute of 1835. The effect of this statute according to the opinions of Judges Stanard, Brooks and Cabell in *Barksdale* v. *Barksdale*, 12 Leigh 548-9, was "that the revocations of wills of personalty must be executed in the same manner, in which the wills of personals were required to be made;" that is, in the same manner as the wills of lands. But by the Code of 1850, the making and revoking of wills of real and personal property, whether by writing or otherwise were placed on the same footing, and so they remain in this State and in Virginia till this time. The opinion of the court therefore in *Malone's Adm'r et al.* v. *Hobbs et al.*, pronounced by Judge Baldwin, 1 Rob. 379 *et seq.* is applicable to our statute-law with reference to the revocation of wills stated hereinbefore. He says:

"The mere act most usually establishes itself; for if a will which had been executed by the testator, and retained in his custody, be found cancelled at his death, or after diligent inquiry can not be found at all, the legal presumption is that it was cancelled or destroyed by himself. But then this presumption is liable to be repelled by proof that the act of cancellation or destruction was done by some one else, without his knowledge and consent. So too, as the mind of the testator must accompany his physical act, every such case is open to proof of a mistake in point of fact: as if he were to throw ink upon his paper instead of sand, or having two wills by him of different dates, should direct one of them to be cancelled or burned, and the person so directed should through misapprehension or inadvertance cancel or burn the other. Still further, if the act in question be not a substantative, independent act, but dependent upon another, the whole forming together one transaction, we must look to the entire design

or purpose, in order to ascertain whether a revocation has been accomplished. Thus, where a testator knowingly cancels, or destroys his will, but with the belief that he has substituted or is about to substitute another in its place, which consequential or preliminary object is defeated by some accident or mistake preventing the execution, or the complete and perfect execution, or the valid effect of the new will; in such cases the work of revocation is incomplete and ineffectual. The purpose must concur with the act. And in this sense it is that there must be *animus revocandi.* But the purpose alone is unavailing, without performance of the act itself. A general intention of the testator to alter his will or change the disposition of his estate; a particular design to cancel or destroy it; an abortive attempt to do the very act in question, even though prevented by accident, fraud or violence, do not effect the legality of the instrument. The will must be cancelled or destroyed. How far the work of destruction must proceed, is not yet settled. It would seem that where the testator has done all that he designed to do for the purpose of actual destruction, and believes that he has accomplished it, a literal compliance with the statute is not indispensable. (*Moore, &c.* v. *Moore, &c.,* 1 Phill. 375). A slight tearing and burning was held sufficient in *Bibb* v. *Thomas,* 2 W. Blackf. 1043. A mere scorching of the envelope not extending to the will it embraced was held insufficient in *Read* v. *Harris,* 33 Eng. Com. L. R. 57."

The decision in that case as set out in the last point of the syllabus is: "Although a testator directs his will to be destroyed and believes that it has been destroyed as requested, yet if it be not in fact destroyed, such direction and belief will not operate as a revocation of the will, even in relation to the personal estate."

If as stated by Angelina Seeds her husband, the testator, on January 9, 1876, very shortly after he made his will of that date, said to her the first time he saw her: "I have made another will, Mr. Bingham has got it; he will give it to you," and she asked him: "What are you going to do with the other will?" referring to the will of 1868, of which she held possession; and he replied, "Burn it," and she did so, but not until January 18, 1876, some three days after her

husband's death, then this burning was obviously no revocation of the will of 1868 for several obvious reasons. If it was the last will of her husband, it took effect at the moment of his death on January 15, 1876, and could be affected by nothing she did afterwards; but if it is true, that she is mistaken as to the time, when she destroyed this will by burning, and that it took place, as she once said, a few days after the will was written and before her husband's death, that would make no sort of difference; for she stated positively and has never said otherwise, that it was not burned in the room, where her husband was or had been, but in a different room, in which no one was, when she burned the will, but herself. It was not in the language of the statute "by the testator or some person in his presence and by his direction burned with intent to revoke." (Code, p. 480). There is no pretence that this burning of this will was done in the presence of the testator; and for this reason alone this burning could not be a revocation of this will of 1868.

But even if it had been burned in his presence and by his direction, it seems to me, that under the circumstances it would not be regarded as a revocation of the will; for the facts seem to show clearly that in the language of Judge Baldwin in 1 Rob. 380: "the act was dependent on another the whole forming together one transaction and it would be a case where a testator knowingly destroyed his will, but with the belief he had substituted another in its place which object was defeated by the new will being held to have no valid effect." In such case Judge Baldwin says: "The work of revocation is incomplete and ineffectual," and it does seem to me it ought to be so held. But be this as it may, there can be no doubt upon the actual facts proven in this case, that this will of 1868 was never revoked and ought therefore to be set up and established. The plaintiffs below in this cause have unquestionably a right to have this done in some court. It would be a disgrace to any civilized community professedly governed by law, if there was not furnished an adequate and efficient mode of establishing and enforcing the rights of devisees and legatees under a will, which had been illegally destroyed, whether this destruction had occurred in the lifetime of the testator or after his death. And it is not

claimed by the appellants, that there is no redress under our laws for such a wrong. The dispute is as to the manner, in which such wrong is to be redressed, and what court has jurisdiction to redress the wrong.

It is contended by the appellants, that under our constitution the county courts alone as courts of probate have jurisdiction to furnish redress for such a wrong; and by the appellees it is contended, that the circuit courts as courts of chancery have exclusive jurisdiction to set up and establish such destroyed will, as was done in this case. It seems to us, that under our constitution and laws such a wrong may be redressed either by the county court as a court of probate or by the circuit court as a court of probate on an appeal from a decision of the county court as a court of probate, or by the circuit court as a court of chancery. A great deversity of opinion has existed in England and in many of the States of the Union, as to whether a court of chancery had any jurisdiction to set up and establish a destroyed will, or whether this could be done only by courts of probate. Some courts held, that the probate courts had exclusive jurisdiction to set up and establish a lost or destroyed will by receiving proof of its due and legal execution by the testator and its legal and due attestation and proof of its contents; and that having established such will the court should declare by an entry on its orderbook the contents of such will and order its contents to be admitted to probate as the last will of the testator and duly recorded as such. Others contended, that a court of probate can admit to probate only such wills as exist and not those, which have been lost or improperly destroyed; and that such lost or destroyed wills can be set up and established only by the courts of chancery. Others, it seems to me, properly contended that a lost or improperly destroyed will may be set up and established in either of these modes; and that in such a case as the one before us the probate courts and the courts of chancery have concurrent jurisdiction.

This controversy as to what courts had jurisdiction in such a case has been long pending having had its origin in England at an early day. For reasons, which I do not deem it necessary to state here, and which it would require almost a

treatise to state at length, and which could only be pointed out by a review of much of English history, the probate of wills of personal property at an early day fell into the hands of ecclesiastics in England. But it was a subject of much doubt, whether the probate of wills was a matter of exclusive ecclesiastical jurisdiction. In ancient times, when a man died without making a disposition of his personal property, the King as *parens patriæ* seized his goods, that they might be applied to his burial expenses and the payment of his debts and to advance his family or kindred. The prerogative was exercised by the king anciently probably through the county courts. (Williams on Ex. 237). At this early day probably probate of wills of personal property, for lands could not then be devised, was had also in the county courts, as the king would not permit himself to be deprived of administering the personal estate of decedents by a will, which a person always had the right to make, without proof being taken, that there had been a will really made by the person, and that a false will was not being set up; and this proof and the will itself was required to be presented to a court. And as the county courts exercised this prerogative of the king for him and administered probably the personal estate of intestates, it is probable they acted as probate courts in the setting up and establishing of the wills of personal property.

Afterwards the crown in favor of the church invested the prelates with this branch of the king's prerogative. This they grossly abused appropriating the decedent's estate to the use of the church; and from time to time efforts were made to correct this abuse by acts of parliament. English history shows how jealous these prelates always were of the inteference of all temporal courts in their offices whether spiritual or temporal, and again and again they involved England in serious conflicts in asserting their rights to have all matters concerning the clergy adjudicated in the ecclesiastical courts and that too without appeal except to Rome. It was natural therefore for them, when the crown conferred on them the king's prerogative of administering the personal effects of intestates and the probate of wills of personal property to deprive the county courts of the jurisdiction they had origin-

ally exercised in these matters; and accordingly we find, that from a very early time the probate of wills was a jurisdiction exercised exclusively by the ecclesiastical courts. Of course they were very jealous of their jurisdiction. At a very early day it was thus well established, that the validity of wills of personal property could only be disputed or established in the ecclesiastical courts.

But in these early days real estate could not be devised in England; on the death of the owner it descended immediatly to his heirs. This continued, till the Statute of Wills, 32 and 34 Henry VIII. was passed. The barons of England had many valuable prerogatives on the lands of minors and were very jealous of the encroachments of the priests on these prerogatives. If objection was made, the ecclesiastical courts were prohibited from probating wills of lands, as they had no jurisdiction over wills of land. (Powell on Dev. 626; 3 Keb. 30, 54; Vent. 207; Cro. Car. 396). At first it was customary to grant a prohibition, when lands and chattels were included in the same will; but afterward the prohibition was only granted as to the lands. Finally when the will bequeathed chattels, though it also devised land, the ecclesiastical courts were not prohibited from probating it entire, as such probate did not prejudice the heirs, because the common law courts did not regard such probate as evidence, it being regarded as a proceeding *coram non judice*. (*Egerton* v. *Egerton*, Cro. Jac. 384; *Hudson* v. *Fisher*, Rep. T. Holt, 180. And *Sir George Sands's Case*, 3 Salk 22; *Habergham* v. *Vincent*, 2 Ves. 230; *Netter* v. *Brett*, Cro. Car. 395; Wms. on Ex. 216). If a will was lost, suppressed or destroyed, and it bequeathed personal property, it would therefore, it would seem, follow as a matter of course, that such will might be established and probated in an ecclesiastical court as a court of probate. And accordingly Swinburn lays it down:

"If a testament be made in writing and, afterwards be lost by some casualty, if there be two unexceptionable witnesses, who did see and read the testament written, and do remember the contents thereof, these two witnesses so deposing to the tenor of the will are sufficient for proof in form of law. In which case the court will grant probate of the will

as contained in the depositions of the witnesses." (Swinburn, 2 S., pt. 14, pl. 4).

And Williams in his work on Executors, p. 209, says: "At this day it is quite clear, that the contents or substance of a testamentary instrument, may be thus established, though the instrument itself can not be produced, upon satisfactory proof · given, that the instrument was duly made by the testator, and was not revoked by him, but when allegations of the fact are made, they must be supported by the clearest and most satisfactory evidence." And this could be done by the ecclesiastical courts, though all the witnesses to the will were dead; but the case had to be proven by the clearest and most stringent evidence. (*Huble* v. *Clark*, 1 Haggard, 115 Eng. Ecclesiastical R. 52; *Foster* v. *Foster*, 1 Adams 462, 2 Eng. Ecclesiastical R. 182.

Under the common law there was no mode, by which a devise of real estate could be probated and recorded once for all. It was simply a muniment of title, and the devisee or those claiming under him, where they offered it in evidence before any court, and it was attacked, had to prove the due execution of the will. If the will contained not only a devise of land but a bequest of personal property, it might be, as we have seen, probated in the ecclesiastical courts. But such probate the common law courts entirely disregarded, so far as it concerned the lands devised, and in a controversy concerning the lands devised the common law courts would not permit such probate to be given in evidence, it being considered *coram non judice*. This was a most serious defect in the common law, for which the English chancery courts furnished a remedy to some extent by entertaining a bill to *establish* a will of realty in favor of the devisee against the heirs. · This it did under one of its general grounds of jurisdiction, that of quieting titles and perpetuating testimony. This *establishing* a will of lands in a court of chancery was almost the equivalent of a probate of the will, as the decree of the chancery court establishing such a will of lands bound not only the heirs but their privies.

It has however been strenuously contended, that this jurisdiction of a chancery court to *establish* a will of real property was confined to cases, where the devise of lands had connected

with it some trust, which a court of equity had to execute, as when the land devised was made liable to the payment of debts or legacies or any other trust created by the will. While it is true, that in very many cases, in which courts of equity *established* wills of lands, there was a trust of some sort on the land created by the will, yet this was not the ground, on which courts of equity entertained bills to establish such wills, though in some of the cases this might be inferred to have been the ground. The whole subject was carefully considered in *Boyse* v. *Rossborough*, 3 DeG. M. & G. (52 Eng. Ch'y) 817, where the numerous cases decided in England, in which chancery courts *established* wills of lands, are reviewed ; and it was decided, that the true ground, on which a court of chancery took jurisdiction to *establish* a will devising land, was not that the will devised the land upon a trust of any sort; and though no trust whatever was by the will imposed upon the land, yet a court of chancery would entertain a bill filed by a mere legal devisee against the heir at law of the testator for the purpose of having the will established against him, though it was not necessary to administer the estate under the direction of a court of equity, and there were no trusts created by the will.

In this country very generally if not universally courts of probate have complete jurisdiction of the probate of wills both of real and personal estate ; and the probate is conclusive upon all parties until set aside or reversed in some proceeding instituted or carried on for the express purpose of reviewing such probate. And now an act of parliment has conferred upon courts of probate in England jurisdiction to determine the validity of wills of real as well as personal property ; and such jurisdiction may be granted in such manner as to make such probate conclusive evidence in all the courts of the validity of the will (20 and 21 Vict. ch. 77 secs. 12, 61–65). Since the passage of this Act of Parliament the practice of establishing a will in chancery is of comparatively rare occurence in England. As was well said in the case of *Harris* v. *Tisereau, et al.*, 52 Ga. 160, *et seq.* :

"As to wills of personality, the defect of which we have spoken did not exist, and there was no call for chancery to remedy it. Probate of wills of personalty against the world

and once for all, was made in the ecclesiastical court. It was of the utmost importance to society that this should be done. The death ot the owner of personal estate devoted his personalty of every discription to his debts, his legatees and distributees. It was, therefore, necessary that it should forthwith appear whether his personal property should be distributed, or go to legatees, and that his debts should be paid before it went to either. Some mode, therefore, of settling once for all whether there was a will, was a necessity of society. This for certain reasons which are a part of the history of England, fell to the ecclesiastical courts, and was performed in all its details by those courts under rules as wide and as little cramped by common law narrowness as were the proceedings ot equity courts. That there was a will, or that there was not, was enquired into, its precise terms were ascertained, it was spread upon a book for the registry of wills, and the court undertook the superintendence of its execution. In the doing of this it exercised powers and followed methods unknown to the common law, derived from the same source, the civil law, as the powers and methods of the court of chancery. It established lost, mutilated and destroyed wills; it set aside its own judgment, and allowed rehearings and reviews for good cause, and examined questions of fraud, accident and mistakes as keenly and searchingly as did a court of chancery. Under such a system even the broad jurisdiction of chancery over fraud might well be considered unnecessary in matters within the scope of the powers ot the probate court. And long since it has been settled that fraud in the procurement of a will is not within the jurisdiction of a court of equity. Whether there be or be not fraud is one of the issues settled by the probate. If there be fraud it is no will. If the will be set up, the judgment settles the matter. And if the application to chancery be before judgment, the reply is the ecclesiastical court is competent to settle it. And though at one time equity would interfere to redress fraud in the *probate* as it would fraud in a common law trial, by acting personally on the parties and compelling them to go into the probate court and do rightly, yet in England that jurisdiction has been rarely exercised, and may now be said to be abandoned, the

power of the probate court to grant new trial, to search the conscience of the parties and to punish for contempt, being ample and complete : See the cases collected and the subject discussed in Perry on Trustees, sec. 182.   But both in England and in this country, this limitation of the jurisdiction of chancery over frauds has not extended so far as to deny the jurisdiction where a will has been *fraudulently destroyed.*   In *Tucker* v. *Phipps,* 3 Atk. 368, Lord Hurdwick asserts the jurisdiction in the very broadest terms.   The case goes upon the general jurisdiction of equity over frauds, and recognizes the rights of the legatee to come into equity against the spoliator, to enforce against him the bequest as a trust.   A distinction is taken between the general probate of the will which properly pertains to the ecclesiastical court, and enforcing the title or right of the legatee, and the chancellor says, that as against the spoliator, the court would not put the legatee to the hardship of establishing the words of the will against the world by probate before the ecclesiastical court.   And so far as I can find there is no decision of a case in England contrary to this.   In *Duttons* v. *Coatsworth,* 1 P. Williams 731, which was for relief against the fraudulent suppression of a deed, two cases are cited by the chancellor when the court decreed the spoliator of a will to hold the bequest in trust for the legatee, though there was no probate of the will; and in *Haynes* v. *Haynes,* 2 Ver. 441, the same question was made and decided."

In this country there is considerable conflict in the decisions on this subject.   In the case, from which the above quotation is made, it was decided, that in Georgia "A court of equity has jurisdiction over all cases of fraud except fraud in the execution of a will, and this jurisdiction includes fraud in the destruction of a will, notwithstanding the exclusive jurisdiction of the ordinary in general over probate and intestate matters."   (Point 2 of Syll).

In the case of *Buchanan* v. *Matlock,* 8 Humph. 390 (47 Am. Dec. 622), it was decided, that "A court of chancery has jurisdiction to set up a will which has been lost, suppressed or destroyed."   Much that I have above said with reference to the origin of the jurisdiction of the ecclesiastical courts in England in matters of probate, has been taken from what

was said by Turley, Judge, in delivering the opinion of the court in this case. After reviewing the English law at some length he says (47 Am. Dec. 628): "From this hasty and imperfect view of this subject, it will be seen, that in England the probate for wills of personalty, is confined to the ecclesiastical courts. That the probate of wills of realty is confined to the courts of law, when brought forward as a muniment of title, or to the chancery court when it is sought to be proven against the heirs. That where a will of personalty is lost, suppressed or destroyed, it may upon clear and stringent proof be set up in the ecclesiastical courts, and that it is doubtful whether it may not be in the chancery court. But that a will of realty, which is lost, suppressed or destroyed, can only be set up in the chancery court.

"Let us, in the second place, inquire, what changes have been effected upon this subject in this State (Tennessee). We have no ecclesiastical courts, no jealousy of conflicting jurisdictions. The county courts have to a certain extent been substituted for the ecclesiasticals. The probate of wills, both for the real and personal property, has been given them by statute. But no other powers of the ecclesiastical courts have been devolved upon the county courts, save those expressly given by statute. The power to receive probates of wills in existence, does not necessarily confer the power to set up wills, which have been lost, suppressed or destroyed; if they have it at all, they must have it in cases for realty as well as personalty, a more extensive jurisdiction on the subject than belongs to the ecclesiastical courts of England. This power, if it exists, must be by implication, for it is not expressly given; if there was no other place where a will under such circumstances could be set up, it would be necessary to insist upon its existence by implication, but, where there is a tribunal, viz: the court of chancery, where such relief can be more effectually given, there is no reason for insisting on it. But on the contrary, there is in our opinion, every reason for denying it.

"There is no similarity between the county courts of our State, and the ecclesiastical courts of England, in their facilities for giving relief in such cases. The ecclesiastical courts, are at all times filled with judges of the highest skill and

ability—there are always in attendance, the most learned doctors, in the common and civil law, and a machinery is possessed by them equal perhaps to any in the world for the investigation and elucidation of doubtful and conflicting facts. Not so with our county courts; the judges are men of no skill in law, entirely disqualified by their vocations and pursuits, from the patient and tedious investigation of facts, necessary to be ascertained for the purpose of setting up a will, either for realty or for personalty, which has been lost, suppressed or destroyed by fraud or accident.

"The jurisdiction for those purposes ought not to be vested in those tribunals. The legislature has felt this so strongly, that it has taken from them the right to try an issue of *devisavit vel non*. How rediculous then, would it be, to leave with them, the more difficult and more important power to set up wills, by parol proof, both for real and personal property. Such jurisdiction is not given by statute, and we will not given it by implication.

"We therefore think, that in any case, where a will has been lost, or destroyed, or suppressed, either by accident or fraud, that it can only be set up in a court of chancery in this State, however it may be done elsewhere."

This reasoning seems to me to be very strong; and with the conclusion, that in any case, where a will has been lost, destroyed or suppressed either by accident or fraud, it can be set up in a court of chancery, I heartily concur; but whether under our statute-law it may not also be done in a county court in the State of West Virginia we will hereafter consider. Though jurisdiction to set up and establish wills, which have been lost, suppressed or destroyed, is no where conferred by statute, yet it is recognized as existing under the general rules, whereby the jurisdiction of equity courts is fixed, as recognized by the common law independent of any statute in a number of States other than Georgia and Tennessee. Thus in *Allison's Devisees* v. *Allison's Heirs*, 7 Dana 90, it was decided that in Kentucky "chancery has jurisdiction to establish a will that is lost or destroyed." (Point 2 of Syll.) And it was in that case also decided, that "the statute requiring the question of *will or no will* to be tried by a jury in certain cases applies, only where a

bill in chancery is filed contesting the validity of a will, after it has been admitted to record in the county court, not where the object is to set up a will in the county court."

In New Jersey in the case of *Bailey* v. *Stiles et al.*, 1 Green's Ch'y 220 (see syllabus) it was decided: "In case of spoliation of a will equity has jurisdiction, and the will may be established in this court. And in order to establish a will in a court of chancery, all the witnesses to the will, if within the power of the court, must be examined. · But if either of the witnesses be dead or insane or without the jurisdiction of the court, the will may be established without the evidence of such witnesses."

In New York in the case of *Grant* v. *Grant et al.*, 1 Sandf. Ch'y 235, it was decided that a will, which had been lost or destroyed, might be established in a court of chancery; and in *Vorhees* v. *Vorhees*, 12 N. Y. 463, it was decided, that by a liberal construction of a New York statute a will might be admitted to probate, though destroyed by the testator in his lifetime while acting under the undue influence of his son.

In South Carolina in *Legare* v. *Ashe*, 1 Ray 464, the chancery court established a lost will.

In Vermont I would infer, that it was there held, that a court of chancery had jurisdiction to set up and establish a lost or destroyed will, from the case of *Mead et al.,* v. *Heirs of Langdon*, decided in 1834, but never reported, but which is approved in the *Heirs of Adams* v. *Adams et al.*, 22 Vt. 59, where it is said, that in this unreported case "the chancery court set up and decreed the payment of legacies, given in a will never proved in a court of probate, but which had been suppressed by those interested in the estate, and administration obtained without regard to the will."

In all these cases except *Harris* v. *Tisereau et al.*, 52 Ga. 153, and *Buchanan* v. *Matlock*, 8 Humph. 390, which have been quoted from above, there is little or no argument by the court, but it is assumed as clearly law, that under its general powers as a court of chancery a court of equity can establish a lost, suppressed or destroyed will.

In opposition to these numerous decisions it has been decided in Ohio, that, "a court of chancery can not entertain jurisdiction to set up and establish a lost or destroyed last

will and testament; the jurisdiction is with the court of common pleas, as a probate court." (*Morningstar* v. *Selby*, 15 Ohio 345). The argument to sustain this position when condensed is, that by Article III., sec. 5 of the constitution of Ohio, it is provided : "The court of common pleas in each county shall have jurisdiction of all probate and testamentary matters, granting administration, the appointment of guardians, and such other cases as shall be prescribed by law ;" and by sec. 3 of the same article, the courts of common pleas within their respective counties "have common law and chancery jurisdiction in all cases directed by law ;" that according to their understanding of the previous decisions rendered by the Ohio supreme court the purpose of their constitution was to keep the ecclesiastical, common law and chancery jurisdiction as distinct as their judicial system would permit, and the probate of a will belongs neither to the common law nor equity jurisdiction conferred on the court of common pleas, but appertains to the ecclesiastical jurisdiction of the English courts, which is specially conferred upon their courts of common pleas as courts of probate ; that it does not signify that it is not by name a court of probate ; that it is a court of common pleas with a probate side; that the same court has jurisdiction of both chancery and common law controversies, and yet this mixture of powers would not avail as an argument to prove that its equity jurisdiction was different in kind from that of courts of chancery in England. To sustain these views they rely upon *Hunter's Case*, 6 Ohio 50, and also upon *Lessee of Swazey's heirs* v. *Blackman*, 8 Ohio 19.

These views seem to me perfectly sound; but they do not sustain the conclusion which was reached by the court. But what they rely upon specially as compelling them to hold, that a court of chancery even had no jurisdiction to establish a lost or destroyed will, is an Ohio statute, which declares, that "no will shall be effectual to pass real or personal estate, unless it shall be duly admitted to probate or record as provided by the act." (Same statute, sec. 33, p. 996). The act is silent about any method of establishing a will by a proceeding in chancery. There is no appeal from the decision, no writ of error or bill of review, no way of vacating it except the pe-

culiar one provided by their statute. Their answer to the argument, that their "act relating to wills," which provides for the probate, filing and registry of wills, supposes the will to be present in court, and there is in it no provision, by which a lost or destroyed will could ever be probated, is this : " Were we to say that such a case as this was not without a remedy, it would not follow, that this remedy is by establishing the will in chancery. It may be that the court of common pleas by the grant of power in Article III., sec. 5 of the constitution is clothed with general powers adequate to give appropriate relief; if not, the legislature can clothe these courts with ample power." They say that a chancery-decree is. not the probate of a will, and therefore it can give no vitality to the will, as the statute above quoted provides, that no will shall pass real or personal property till probated; and again they argue, that, if the will were established by the chancery court, another might afterwards be probated by the court of common pleas, which would necessarily be good, as the chancery proceeding would be regarded as *coram non judice* and void, and the statute is express as to the effect of the probate. This last argument seems to me to be a mere begging of the question. For if the chancery court has jurisdiction to set up and establish a lost will as the lost will of a decedent, of course the court of common pleas could not probate any other will as the last will of the decedent; and such probate would be as ineffectual, as if the probate court without setting aside its probate of a will were afterwards to probate another. Such second probate would of course be a mere nullity. The first difficulty might be met by the probate court as a matter of course probating, filing and registering the last will as established by the court of chancery, and the court of chancery could order a copy of the decree establishing the last will to be certified to the court of common pleas, that this might be done.

This was the course which the court below pursued in its final decree establishing the destroyed will of John J. Weaver, which is now before us for review. Perhaps the difficulty presented by this statute-law of Ohio, might be got over in the same way, that the courts have got over the statute of frauds, that " no action shall be brought upon any contract

for the sale of real estate, unless the contract or some memorandum or note thereof be in writing and signed by the party to be charged thereby or his agent."· Despite this provision, which is as positive and clear as the provision of the Ohio statute above quoted, verbal contracts for the sale of land accompanied by the delivery of possession of the land are constantly specifically enforced by courts of equity, they not being regarded as coming within this provision of the statute of frauds when equitably construed.

But if this Ohio decision can be sustained at all, it is only because the Ohio statute takes from the courts of equity their power of setting up lost, suppressed or destroyed wills; and if that is the case, the decision would have no weight except in Ohio, unless there was found a similar provision in the statute-law of the State, where this Ohio decision was relied upon as authority. It is I suppose also true, from what is said in *Gaines* v. *Chew*, 2 How. 619, and *Gaines* v. *Hennen*, 24 How. 553, that in Louisiana a lost or destroyed will can be set up only in a court of probate. But this can have no effect in aiding us to reach a conclusion in this case on the point, which we are considering, because the entire basis of the Louisiana law is variant from the basis of the law in this State. Their law is founded on the civil law; ours on the common law. And perhaps in Massachusetts (see *Waters* v. *Stickney*, 12 Allen 1), a lost or destroyed will can be set up only in a probate court. It is certain it can be set up in a probate court in Massachusetts. (*Clark et al.* v. *Wright*, 3 Pick. 67, and *Davis et al.* v. *Sigournoy*, 8 Metc. 487). But we can not thence infer, that a court of chancery has not like jurisdiction; for the jurisdiction might well be concurrent in chancery courts and courts of probate, just as courts of common law and chancery courts have concurrent jurisdiction in cases of fraud.

As far as I have been able to ascertain, there is but one case, in which it was decided, that a court of probate had not jurisdiction to set up and probate a will, which had been lost, suppressed or destroyed, and that is the case of *Buckhanon* v. *Matlock*, 8 Humph. 390 (47 Am. Dec. 629). We have seen, that the probate courts may set up and establish and admit to probate lost, suppressed and destroyed wills in England, in

Louisiana and in Massachusetts. It would seem they could hardly have held otherwise in Massachusetts, as the probate courts there may and do have juries to try if desired an issue of *devisavit vel non*. It has also been decided, that probate courts may establish and probate lost or destroyed or suppressed wills in Kentucky (*Happy's Case*, 4 Bibb 553), in Mississippi (*Graham* v. *O'Fallin*, 3 Miss. 507), and in Alabama (*Apperson* v. *Cotnell*, 3 Port. 51). These decisions are based on the ground, that when not restrained by statute-law the court of probate in any State ought in probating wills to have jurisdiction to probate any wills, where the ecclesiastical courts of England had such jurisdiction, and where no act of Parliament conferred on them any special power to probate such will; and as these ecclesiastical courts of England have always probated lost, suppressed or destroyed wills, after having first established them by necessary proof of their due execution and acknowledgment and also proof of their contents, the probate courts in the United States would necessarily have jurisdiction to do the same, unless prohibited from so doing. In Alabama in the case of *Apperson* v. *Cotnell*, 3 Port. 51, the court go further and seem to consider, that as a general rule their probate court alone has jurisdiction o set up and establish a lost or destroyed will, and a court of equity has no jurisdiction ordinarily in such case, as that court would do it by referring to a jury the issue of *devisavit vel non*, and in that State probate courts can also try by juries issues of *devisavit vel non*. But it is not denied, that courts of chancery may in that State establish a lost or destroyed will, where there exist grounds of equitable jurisdiction, such as would justify the court in assuming jurisdiction in a case, which but for such grounds could only be tried in a common law court.

My conclusion then is, that in the various States of the Union chancery courts have and ought to have jurisdiction to set up and establish wills, which have been lost, suppressed or destroyed, except where by some peculiar provision of the statute-law equity courts are deprived of jurisdiction in such cases; and that probate courts have in such cases concurrent jurisdiction with the chancery courts, unless their jurisdiction is so restricted by statutory law as to clearly indicate, that the legislature did not design in any case to permit them to admit

to probate a lost or destroyed will. These conclusions, it seems to us, are supported not only by reason but also by the great weight of authority. I am also of opinion, that this Court really has now no discretion in the decision of these questions, they having long since been decided by the Virginia court of appeals in cases, which are binding authorities on this Court having been decided long prior to the formation of this State.

Thus in *Lemon* v. *Reynolds*, 5 Munf. 552, decided in April 1817, it was held, that a county court or a court of probate can set up and establish a will and have the same recorded. In *Banks* v. *Booth*, 6 Munf. 385 it was decided, that a court of chancery can set up and establish a lost or destroyed will; and that in such a case issue out of chancery should be directed to ascertain facts essential to a just decision of the cause. This case was decided in April, 1819. The same was decided in March, 1821, in the case of *Brent* v. *Dodd*, Gilmer 211. These cases assumed that a court of probate in Virginia could set up a lost or destroyed will and probate the substance of it as proved by witnesses and have the will thus established recorded as the last will of the deceased; and that the same could be done by a court of chancery in effect by its setting up and establishing the will, which had been lost or destroyed; but these cases do not show, what should be the form of a decree of a court of chancery establishing and setting up such a will. Though no reasons are assigned for these decisions, yet, as we have seen, they are supported both by reason and the weight of authority and must be regarded as binding authority on us, unless the law has been changed either by constitutional provisions or changes in the statute-law.

The constitution of Virginia in force, when these decisions were rendered, was the first constitution of the State adopted June 29, 1776, and to be found in the Revised Code of Virginia of 1814, pp. 3–7. This constitution simply recognized the existence of the county court (sec. 15, p. 6). It did not define its jurisdiction; this was left to the legislature. Its jurisdiction in reference to probating wills was defined by ch. 42 of the Code of 1814, p. 224 *et seq.* By sec. 10 of this chapter it was provided: "The several district, county

or corporation courts shall have power to hear and determine all causes, matters, suits and testamentary controversies, arising within their respective jurisdictions, and to examine and take the proof of wills and grant certificates thereof." Section 14, p. 227 provided: "When any will shall be exhibited to be proved, the court having jurisdiction as aforesaid may proceed immediately to receive the probate thereof and grant a certificate of such probate. If however, any person shall within seven years afterwards appear and by his bill in chancery contest the validity of the will, an issue shall be made up, whether the writing produced be the will of the testator or not, which shall be tried by a jury, whose verdict shall be final between the parties, saving to the court a power of granting a new trial for good cause as in other trials; but no such party appearing within that time, the probate shall be forever binding, saving," &c., (*i. e.* to persons under certain disabilities further time).

The present constitution of West Virginia as amended in 1880, provides with reference to the probate jurisdiction of the county courts as follows : "They shall have jurisdiction in all matters of probate, the appointment and qualification of personal representatives, guardians, committees, curators and the settlement of their accounts, and in all matters relating to apprentices" (Article VIII., sec. 24 of Constitution, Warth's Amended Code of W. Va., p. 27). In defining the jurisdiction of the circuit courts the Constitution declares. "They shall, except in cases confined exclusively by this constitution to some other tribunal, have original and general jurisdiction of matters at law where the amount in controversy exclusive of all interest, exceeds $50.00 ; and of all cases in equity and of all crimes and misdemeanors. They shall also have such other jurisdiction whether supervisory, original, appellate, or concurrent as is or may be prescribed by law," (Constitution, Article VIII., sec. 12, Warth's Amended Code p. 25). These provisions are the same as those found in the Constitution of 1872, except that the last clause in sec. 12, of Article VIII., was simply. "It shall have such other original jurisdiction, as may be prescribed by law." (Acts of 1872–3 p. 27). In the exercise of its power under this provision of the Constitution the Legislature on November 21, 1873,

passed an act that "the circuit court shall have concurrent jurisdiction with the county courts in all matters of probate of wills, the appointment and qualification of personal representatives, guardians, committees and curators and the settlement of their accounts." (Acts 1872-3, ch. 136, p. 456–7). This act was by the amendent of sec. 12 of Article VIII., of the Constitution of 1872 adopted in 1880 and given above continued in force which declares, that the circuit courts should "have such other original or concurrent jurisdiction as is or may be prescribed by law." This act while not inserted in the act found in Warth's Amended Code of W. Va. as ch. 77 p. 568, and passed in 1882, (see Acts of 1882 p. 194) is not thereby repealed, so far as I can see, unless it be regarded as impliedly repealed, because this act was apparently intended to cover the whole subject of the probating of wills by courts of probate in this State.

Be this as it may, it seems to me immaterial, so far as the case before us is affected, whether the circuit courts have or have not original and concurrent jurisdiction with the county courts in matters of probate. Sec. 22 of ch. 77 of Warth's Amended Code of W. Va., passed in 1882, p. 572, provides that "the county court shall have power and jurisdiction to hear proof of and admit wills to probate." And sec. 26 of said ch. 77 p. 573, provides that "the clerk of any county court during the recess of the regular sessions of said court may admit wills to record upon the same proof and with like effect, as the said county court could do if in session; but no contest as to such probate or record shall be heard or determined by the clerk," and then proceeds to declare how such probate by the clerk is to be confirmed by the county court, and how wills are to be offered for probate and probated in the county court. These provisions are contained in sections 26, 27 and 28 of ch. 77 of Warth's Amended Code pp. 573–4. Section 29 provides for appeals from the decision in matters of probate by the county courts to the circuit court, where it is to be tried and determined regardless of the proceedings before the county court or the clerk thereof and in all respects as if the application for such probate had been originally made to the circuit court. . Section 30 provides for an issue of *devisavit vel non* on such appeals to

be tried before the circuit court, if any party desires it.    Section 31 declares, that an order of a county or of a circuit court on such appeal admitting to probate or refusing to probate a will shall bar a bill in equity to impeach or establish such will, unless on such a ground, as would give a court of equity jurisdiction over other judgments at law.    Section 32 provides, that after such a sentence or order a person interested, who was not a party to the proceeding, may within five years proceed by bill in equity to impeach or establish the will, on which bill, if required by either party, a trial by jury shall be ordered to ascertain, whether any and, if any, how much of what was so offered for probate be the will of the decedent.    If no such bill be filed within that time, the sentence or order shall be forever binding.    Section 33 extends this time in favor of infants and of non-residents in certain cases.

There is not in the provisions of our present Constitution or in any provisions of our statute-law anything, which I can see, which renders the decision before cited in 5th and 6th Munford and Gilmore's Reports inapplicable in this State now.    There has been no change in the Constitution or in the statute-law, which would take from a court of chancery its jurisdiction, which it has always had in Virginia and West Virginia, to set up and establish lost, suppressed or destroyed wills.    There may be less occasion for such bills, now that the parties may by appeal bring such a case before the circuit court for trial *de novo*, and there have a jury to try the issue of *devisavit vel non*, which would seem to be as efficient a remedy, as could be obtained by a bill in chancery to set up or establish a will which has been lost or destroyed. But as there is no provision in the statute, which provides this new remedy, whereby any party interested may obtain in the circuit court as an appellate court of probate a trial by a jury of an issue of *devisavit vel non*, where he asks a probate of a lost or destroyed will, (ch. 77 of Amended Code of West Virginia, p. 568 *et seq.*), which takes away the then existing remedy of a bill in chancery to set up or establish a lost or destroyed will, such remedy continues on general principles often recognized.

I can not see, that the fact, that the county courts have

exclusive jurisdiction of matters of probate, if such were the fact, could take away the jurisdiction of a court of chancery to establish lost or destroyed wills. On the contrary it would be rather a reason why there should be more frequent application for the exercise of this recognized power of the chancery court. The fact, that the will of 1868 of John J. Weaver though destroyed might have been probated by the county court, and upon appeal the circuit court might have ordered an issue of *devisavit vel non*, might have well operated with the plaintiffs in this suit as a strong reason, why they should not bring this chancery-suit to set up and establish this will. Yet this statute-law did not take away the admitted jurisdiction of the chancery-court in such a case as the present; and if the plaintiffs chose to resort to this forum, they had a right to so do. As the evidence clearly and fully established the due execution and acknowledgment of this will of John J. Weaver of 1868, and that he was when he made it of sound mind and disposing memory and never had revoked it, but that it had been destroyed not in his presence, and also fully established the contents of the destroyed will, as these contents are stated in the decree of the court below rendered May 8, 1885, the court properly set up and established this will by said decree, and that too without awarding an issue of *devisavit vel non* to be tried by a jury, none of the the parties desiring it, and there really being no doubtful fact necessary to make out the case of the plaintiffs. The court also very properly ordered that a certified copy of the decree be made out by the clerk of the court and by him transmitted to the clerk of the county court of Mason county to be by him duly recorded as and for the last will and testament of John J. Weaver, deceased, with leave to the proper persons to qualify themselves as the personal representatives of said testator. The decree when entered in this form places this will established by the chancery court of record in the same office, that it would have been recorded in, had it never been destroyed but had been regularly probated in the proper court. And the form, in which it would appear, is the form in which this will would have appeared, it it had been probated as a destroyed will in the county court of Mason, or if it had been probated by an order of the circuit

court of Mason acting as an appellate probate court on an appeal from the county court of Mason under said ch. 77 of the Amended Code of West Virginia.

The court obviously did not err in refusing to exclude entirely the deposition of Angelina Seeds. She certainly was competent to testify, that she after her husband's death destroyed his will; and this is all of her testimony, which the plaintiffs needed.

For these reasons the decree of the circuit court of May 8, 1885, must be affirmed; and the appellees must recover of the appellants, J. S. Stone and Elizabeth Stone, his wife, Charles Weaver, Henry Weaver, G. B. Rayburn, Cassie Sayre, Cassie Rayburn, Jake Brinker, Joseph McKinley and Adley McKinley their costs in this suit expended and $30.00 damages; and as to all the other appellants the appeal must be dismissed as improvidently awarded, none of them having appeared in the circuit court of Mason county in this cause.

AFFIRMED.