WILLIAM CRIGLER *et al.* *v.* SALLIE T. LUKENS *et al.*

(No. 8691)

Submitted October 4, 1938.   Decided December 6, 1938.

*H. G. Kump* and *B. M. Hoover,* for appellant.

*E. L. Maxwell, H. G. Muntzing, M. S. Hodges, Lively & Lively, Max Schoenberg* and *C. C. Wise,* for appellees.

FOX, JUDGE:

In this case Judge Maxwell, for reasons satisfactory to himself and his associates, is of the opinion that it would be improper for him to act, and the court, as constituted

in his absence, being equally divided on the decisive questions raised on the record, this opinion is written to represent the views of Judges Hatcher and Fox thereon.

Sallie T. Lukens appeals from a decree of the Circuit Court of Randolph County, entered on the 8th day of July, 1937, in a suit in equity in which William Crigler and Macie Bennett Brake were plaintiffs, and Sallie T. Lukens and others, defendants.

The suit was one to establish a will alleged to have been executed by C. Ed Lukens on the 5th day of August, 1936, and which, it is averred in the bill, was lost, suppressed or destroyed after the death of the testator. The bill was filed at January Rules, 1937, naming Sallie T. Lukens, widow, John Anderson, James B. Baker and Bruce Pritt, administrators of the estate of C. Ed. Lukens, John Lukens and other interested parties as defendants. John Lukens filed his answer in term neither admitting nor denying the allegations of the bill, but calling for full proof thereof; Sallie T. Lukens filed her answer averring that she had no personal knowledge of the execution of the will sought to be established, and denying the allegations of the bill with respect thereto; and the administrators filed their joint answer denying any personal knowledge of the execution of the alleged will, and calling for full proof thereof. These answers were all filed prior to any decree in the cause.

Depositions were taken on behalf of the plaintiffs tending to show the due execution of the will, as alleged, and the existence thereof at the date of the death of C. Ed Lukens. On April 5, 1937, the cause was heard upon the bill, answers filed, and the depositions aforesaid, and a decree entered by which the court found:

"Upon consideration whereof, the Court is of opinion that C. Ed Lukens on the 5th day of August, 1936, made, signed and acknowledged a written will as and for his last will and testament, as charged in plaintiff's Bill of Complaint and in their depositions proven; and the Court is further of opinion, as charged in the Bill of Complaint and by the depositions on behalf of

the plaintiffs proven, that said will made, signed and acknowledged on August 5th, 1936, by the said C. Ed Lukens, has been revoked, lost, suppressed or destroyed. All of which is accordingly adjudged, ordered and decreed."

The court then proceeded to determine the contents of the will, the execution of which it had found as a fact, using a carbon copy thereof as the basis of its finding, and setting out the same *in extenso;* and upon motion of the plaintiffs, resisted by Sallie T. Lukens, further decreed:

"That an issue be, and the same is hereby directed, to be tried before a jury at the bar of this Court, to ascertain whether any, and if any, how much, of the paper writing aforesaid purporting to bear date on the 5th day of August, 1936, the contents of which are hereinbefore ascertained, and which purports to be the will of C. Ed Lukins, deceased, and which has been revoked, lost, suppressed or destroyed, is the will of the said C. Ed Lukens, deceased."

In submitting the issue, the court provided that the bill and answers might be read to the jury, not as evidence, but merely to define the scope of the issue.

The case was tried by a jury and the following verdict returned:

"We, the jury, find that the Will made and executed by C. Ed Lukens on the 5th day of August, 1936, and each part thereof, is the last Will and Testament of the said C. Ed Lukens, deceased."

A motion to set aside the verdict of the jury was overruled, and exceptions to such action saved on the record, and on July 8, 1937, the court entered a decree establishing the last will and testament of the said C. Ed Lukens as alleged in the bill of the plaintiffs. From this decree, Sallie T. Lukens appeals.

In the trial of the issue of *devisavit vel non* the plaintiffs introduced all of their available testimony on the

question of the actual execution of the alleged will of August 5, 1936, as well as the testimony tending to show that the said will was in existence at the date of the death of the testator; they also introduced evidence tending to show opportunities on the part of Sallie T. Lukens, John Anderson and others to destroy or suppress the will. They attempted to make out a full and complete case before the jury, not only as to the execution of the will, but its continued existence to the date of the death of the testator, and that it was suppressed or destroyed by parties whose interests would be served thereby. After the completion of all testimony on behalf of the plaintiffs, they offered the decree of April 5, 1937, as evidence of a fact found by the court, which was so admitted over the objection of the defendant, Sallie T. Lukens, and an exception taken. Following this, the court by instructions 2, 3, 8, 9, and 12, offered by the plaintiffs, told the jury that the execution of the will of August 5, 1936, had been established as a fact by the court, thus, in effect, taking from the jury all power to pass upon the testimony bearing upon that question. The admission of the decree as a finding of fact by the court, and the giving of the several instructions furnishing added weight to this decree, is assigned as error and is the principal objection to the verdict raised on questions of procedure. Consideration of other errors assigned require an understanding of the facts of the case.

According to the evidence, C. Ed Lukens, a resident of Randolph County, the owner of valuable properties in said county and in the State of Montana, appeared in the office of H. G. Muntzing, an attorney at law, in Moorefield, West Virginia, on the morning of August 5, 1936, and requested Muntzing to prepare his, Lukens' will. He gave the attorney directions for the disposition of his property, and the alleged will was dictated by the attorney to a stenographer in shorthand and by her transcribed. While the will was being dictated and transcribed, Lukens met Albert R. Leatherman on the streets of Moorefield, and requested Leatherman to accompany him to

the attorney's office, which he did. Lukens then read the paper prepared by the attorney, approved the same, and it was signed by him in the presence of Muntzing and Leatherman, who, at the request of Lukens, signed their names as subscribing witnesses. Muntzing then placed the executed paper in a large envelope on which his name and address appeared, placed the endorsement "Last will and testament of C. Ed Lukens" thereon, and handed the envelope containing the executed paper to Lukens. A carbon copy of this paper was retained by Muntzing and placed in his files. These facts are established by the testimony of H. G. Muntzing and Albert R. Leatherman and the stenographer, Carrie Muntzing, a sister of the attorney. Within a few days thereafter, Lukens made a trip to Montana, and returned to this state on or about the 20th day of August, 1936. On that day he visited John Kerens, a tenant on one of his farms near Beverly, and also visited another farm located near Huttonsville. He told Kerens on that day that he was going to stop "down town" (Elkins) to see Earl Maxwell "on a little business." Maxwell was at that time his attorney in Randolph County, and it is admitted that he saw him that day. The same day or the next he went to his home near Harmon. On Sunday, August 23, 1936, he became ill and was confined to his bed. He remained at his home until the morning of August 27, 1936, when he was taken to a hospital in Harrisonburg, Virginia, where he died on the night of August 28th.

After the beginning of his last illness, and while he was at his home, certain events and circumstances occurred, and statements made, which, it is contended, have a bearing on this controversy. These will be stated. Leona Cook, a niece of Lukens, states that during this time, and while he was in bed, he called for his pen, and when asked what he wanted with it, said "He wanted to write his will." He was handed the pen, and he made some effort toward writing. He did no writing and there is no evidence that he was furnished paper on which he could have written. This statement is supported by the

testimony of Charles Judy, one of the executors under the alleged will of August 5, 1936, but Judy expresses some doubt as to whether Lukens was mentally capable of understanding his acts at this time. Grace Smith says that she visited Lukens during this time, and that a Mr. Underwood said to him "Ed, if you don't go to the hospital and get something done for you, you are going to die" and that Lukens said "he wouldn't mind dying if he had his business fixed up", and then called for a little black bag he had there; Underwood got some papers out of the bag and Lukens looked to see if a bank deposit he had made had been credited, and being satisfied on this point shortly thereafter decided to go to a hospital. This statement is corroborated by Underwood and A. K. Gilmer. Robert Lamb, an employee of Lukens, says that when his last illness began he was called to assist, and that Lukens said to him "Bob, this is going to kill me", and witness said "Ed, maybe not", and that he then said "You know I wanted you to have something but I ain't got nothing fixed." Frank Warner, a witness for the plaintiffs, states that Lamb, in giving to him his version of this conversation, said that Lukens told him, Lamb, "I am sick and they are coming to take me away and I don't have nothing fixed for you." On the morning of August 27, 1936, when Lukens started for the hospital, Underwood says he asked John Anderson to get his grip and it was given to him and he opened it and said "Everything is here now that I want and I am ready to go." He was accompanied to the hospital by John Anderson, his brother-in-law, Charles Judy and C. R. Underwood. Anderson is the same person against whom Lukens warns his widow in the written will as established.

Mention is made above to the black grip. It is clear from the evidence that Lukens customarily carried a grip which contained his valuable papers and it was rarely out of his possession. It was at the hospital when he died, and was turned over to the hospital office, and by that office delivered to the undertaker who carried it to Franklin and delivered the same to John Anderson. This

is the grip so frequently mentioned in the record. In this connection it may not be amiss to mention a characteristic of Lukens with respect to the execution of wills at different times. M. J. Roy testified that he had witnessed wills for him on two or three occasions, and Arthur Cooper says that he witnessed four or five wills for him. He also says that on each occasion the wills were placed in the grip he carried with him.

Lukens reached the hospital in Harrisonburg about 5:30 P. M., was assigned to a room, and a physician called. An acquaintance, Ruth Zigler Bowman, saw him shortly after he was admitted. She says that he stated to her "that he had been here sometime previous and he should have stayed at that time, but he said he had some things that ought to be tended to before he could come back, so he said he went back and had his business fixed and he said he was ready to die." Dr. F. L. Byers was the first physician called, and was present when Lukens was undressed and put to bed. Either the orderly or one of the men with Lukens carried a bag to his room, and it, along with his clothes, was put in a closet in the room occupied by him. Eva Fisher, sometimes referred to in the record as Mrs. Charles Fretwell, was assigned as nurse, and began her duties about 8:30 that evening. She remained on duty until about 7:30 A. M., next morning, when she was relieved by another nurse, Mildred Craun, who, except for about 20 minutes taken for lunch, remained with him until about 7:30 of the 28th, when Eva Fisher returned to duty and remained with the patient until he died that night. While Mildred Craun was at lunch, her patient was cared for by Margaret Lewis Dyer. Eva Fisher says that Lukens seemed to be rational at all times while he was in her charge; that when she went to his room and told him she was to stay that night he asked where his grip was, and that she then looked in the wardrobe, and found it, and told him where it was. She then says: "I asked him if he wanted anything out of it and said no, he just wanted to know where it was, that he had some important papers and his will

in it." Aside from this statement Lukens did not discuss his business affairs, mention his will or other papers or refer to the grip, in any conversations he had with any of the nurses or physicians, who cared for him in the hospital. Both the nurses and physicians say that he was not physically able to have arisen from his bed while he was in the hospital, but notwithstanding these opinions, it must be remembered that he had been able to make a day's journey by automobile, and the possibility that he might have been able to dispose of the will is not entirely eliminated. It should be stated, however, that there is no evidence, aside from the opportunity to do so, tending to show that he destroyed the will while in the hospital.

According to the testimony of Albert R. Leatherman, another event at the hospital bears on the question. On August 28th, about noon, Leatherman says he went to the hospital and had a conversation with Lukens. This statement that he visited the hospital on that day is supported by the testimony of K. G. Vance, but not as to any conversation with Lukens. Leatherman says that he went to the hospital, entered the north wing and endeavored to locate Lukens. He saw a woman employee who was moving away from him, and he did not speak to her. He then went along the hall looking into the rooms. In his deposition given on February 12, 1937, he states: "I saw a door ajar and I saw Mr. Lukens' head in bed there, so I just passed in." The following conversation then ensued: Lukens said to him: "This is the first time I have seen you since I saw you in Moorefield when you witnessed my signature," and Leatherman said "Yes, but Ed you are not going to need that now" and he then said "Perhaps not, but if I need it it's in the grip." The deposition of the superintendent of the hospital given on May 10, 1937, is to the effect that on account of the location of the bed in the room occupied by Lukens and the direction in which the door to the room opened, the door would have had to be 135 degrees open to permit a person passing along the hall to see Lukens in the bed, except through the

crack made by the opening of the door. When Leatherman testified at the trial before the jury in June, 1937, and when asked on cross-examination, "How did you see him in the room", he said "I saw him through the crack of the door—I am not certain I saw him through the crack of front of door or back of door. I was looking in each room as I passed by, and I could have seen him through either side of the door, I think." In his deposition he said "I don't imagine I was in his room more than five minutes" and in his testimony before the jury, when asked as to the time he was in the room, said "I wouldn't attempt to say definitely, but only for a very few minutes." No one saw Leatherman in the hospital, and the nurses who waited on Lukens on the 28th of August say that they were not out of the room for as much as five minutes during that day.

As has been stated, according to some of the evidence, the grip was delivered to the office at the hospital, but K. M. Higgs, the funeral director at Harrisonburg, says he got the grip from the room when he received Lukens body. The next we hear of it is that it was delivered by Higgs to T. R. Brown, the funeral director at Franklin, on August 28th, who transported the body of Lukens and the grip to Franklin, and locked up in his preparation room. The grip was then delivered by him to John Anderson in the presence of William Crigler, one of the plaintiffs herein, and was carried to Crigler's home. While at the Crigler home, the grip was opened and some of the papers examined in an effort to get the addresses of some of Lukens' relatives. Reginald Smith assisted the daughter of Crigler in the search for these addresses, and states that while so doing he saw a large envelope on which was the name and address of H. G. Muntzing, Attorney-at-Law. He made no examination of the envelope, does not state that it contained any papers, nor does he state whether or not any written endorsement appeared thereon, nor does he remember any name or address or other endorsement on any other paper he examined on that occasion. The grip was then delivered to John Anderson,

with the understanding, as Crigler states, that it was not to be opened until the following Friday, when Anderson and Crigler were to go to the home of Sallie T. Lukens, the widow. The grip was taken from Franklin by John Anderson and Sallie T. Lukens on Saturday, August 29th, and at the request of Mrs. Lukens, Anderson took the same to his home and kept it in a bedroom until the following Wednesday when Sallie T. Lukens and Mary L. Wyckoff, a sister of C. Ed Lukens, went to the Anderson home, in his absence, partially examined the contents of the grip, and then carried the grip to the home of Mrs. Lukens, where the examination was completed. Anderson admits making an engagement with Crigler to examine the papers in the grip on Friday if Mrs. Lukens would consent, and gives this explanation of his failure to keep that engagement. On September 3, 1936, John Anderson, James B. Baker and Bruce Pritt were, on motion of the widow, appointed administrators of the Lukens estate, the grip and papers turned over to them, and by them deposited in the vault of the Davis Trust Company in Elkins, and afterwards carefully examined. The testimony of all the persons who examined the papers in the grip, is that no will was found, and those who had an opportunity to examine the papers therein, including the widow and the three administrators, deny any knowledge of the existence of any will.

A line of testimony introduced by the plaintiffs, and to which strenuous objections were made by the defendant, shows statements alleged to have been made by Lukens before the execution of the will on August 5, 1936, respecting the disposition of his property and his attitude towards the persons and institutions to whom bequests were made therein. It will be noted that one of these bequests is to the Presbyterian Church of Franklin. A former pastor of this church testified that about five years before, and about the time Lukens had been injured in an automobile wreck, he had a conversation with him in which they discussed matters affecting the work of the church, and that Lukens said that "he had made his will

several times and changed it, always destroying the old one after he made a new one", and when reminded that wealthy men often made bequests to the church, said "Mr. Patterson I never had thought of that, the next time I make a will I will remember this church." Ernest Bowman testified as to the close relationship between Lukens and William Crigler, another legatee, and the treatment Lukens had received in his, Crigler's, home, and his appreciation thereof. J. P. Ruddle testified as to Lukens' saying in the Crigler home at the time he was recovering from the effects of the automobile wreck, and his statements as to the kind treatment he had received, and his further statement "that he intended to take care of them in time to come." McClellan Mellenex and his wife testify as to a visit Lukens made to their home, about February, 1935, when the former wife of Lukens (the plaintiff, Macie Bennett Brake) was discussed and that he said "Well, I never expect to see her suffer while I live", according to the version of Mellenex, and "Yes, I had a fine woman. I will never see her suffer while I am living", according to Mrs. Mellenex; she was not certain whether Lukens said "fine woman" or "fine looking woman." Other objections to testimony offered by the plaintiffs include the statement of William Crigler that Irving Ritchie, a legatee under the alleged will, told him, in effect, that the will of Lukens would be found in the grip; and the statement as to the value of the two farms conveyed to Sallie T. Lukens in the lifetime of her husband.

Another element of the case, which is the subject of much controversy, grows out of testimony of E. L. Maxwell, one of counsel for the plaintiffs, and involves, to some extent, the other counsel, H. G. Muntzing. Muntzing prepared the will of August 5, 1936, and shortly after the death of Lukens made some statement in relation thereto. Acting thereon, the interested parties, William Crigler in particular, quite naturally began an investigation to ascertain the facts in relation to the will. Muntzing seems to have been consulted not later than September 26, 1936, because on that date he prepared a

706

letter addressed to John Anderson, and which Crigler signed, in which the opening of the Lukens grip in the absence of Crigler was referred to and condemned, and the statement made that it could be proven that Lukens had a will. Crigler states that at the time this letter was written he had employed Muntzing with the understanding that E. L. Maxwell was to be associated with him in the case. Both Muntzing and Maxwell state on the record, but not as witnesses, that they were not employed as Crigler's attorneys at the time this letter was written, and Maxwell says he was not employed in this case until a few days before the 29th day of December, 1936, when this suit was instituted. A. G. Layton testifies that H. G. Muntzing accompanied him to the home of Sallie T. Lukens, shortly after the death of C. Ed Lukens, about the middle or last of September, and inquired of her as to the contents of the grip, and that he said he was making this trip for Crigler. On November 3, 1936, Maxwell wrote John Anderson requesting him to call on him to discuss an important matter, and a short time thereafter Anderson saw Maxwell in Elkins. Anderson says that Maxwell informed him that Muntzing had been to see him about a will of Mr. Lukens and "wanted him to go in with him"; that Maxwell spoke of the bequest of $7,500.00 to Crigler, and then said: "Now, I would suggest that you suggest to Mrs. Lukens and her attorney that she pay Mr. Crigler this $7,500.00 and retain Mr. Muntzing as her attorney, if anything further comes up." Maxwell admits the substance of this statement, but says he had not agreed to enter the case as counsel at the time it was made. The testimony and statements with reference to the suggestion made by Maxwell to Anderson appears as an avowal on the record, and on objection of the plaintiffs was not permitted by the court to go to the jury. That action of the court was excepted to at the time, and is now assigned as error.

It is contended by Sallie T. Lukens that the suggestion made by Maxwell to Anderson, set out above, has a direct bearing upon the testimony of Maxwell with respect to

the existence of a will of C. Ed Lukens at the time of his death. Maxwell was called as a witness by Sallie T. Lukens, and asked the following question: "Did you or did you not state to John Kerens on the street in the City of Elkins—on Davis Avenue between Third Street and Fourth Street—a very few days after Mr. Lukens's death —the exact date I cannot fix, that in the death of Mr. Lukens you and Mr. (Kerens) lost a good friend, and in talking to Mr. Kerens at that time did you not mention the fact that no will had been found, and you stated to Mr. Kerens that Mr. Lukens had been at your office a few · days prior to his death and asked you to prepare a will for him and you stated to him that you were busy at the time, and if he would come back in about two hours you could do the work for him, and that he did not come back, or words to that effect" to which he replied: "I probably did", and when pressed for a direct answer, said: "I think I probably did tell Mr. Kerens that", but made an explanation which in complete fairness to him we quote:

"This letter bears date May 5, 1937. That is my stationery and that is my signature. I am certain that I made that statement to Mr. Kerens, and I probably made a similar statement to Mr. Hoover on the street, or on the telephone, I don't know about that fact, but the more I thought about the matter, not having any book records as to when Mr. Lukens was in my office, or what days he was there, or what things I did on specific days for him, as he paid me by the year, I had no definite way to remember when he did talk to me about a will—he never told me in his life he didn't have a will. He did, however, upon one occasion, speak to me about what he ought to do with his property in fact, he spoke to me twice, once at the Delmonte Hotel, when he took suddenly ill and sent for me, and another time in my office. In running over, and studying it out in my mind, the many times that Dr. Lukens had been in my office, and trying to find out when it was that he came there for the purpose of discussing a will, I am now satisfied and know as a matter of fact that it was before he

went to Montana sometime, and the reason I know that is that I was in the County Clerk's office. After studying this matter all out, I know I was in the County Clerk's office and Mr. Lukens was in there, and he asked me if I would go to my office, and I said 'Yes,' and he said 'I want to see you,' and the thing that helped me to remember that was Mr. Ralph See was present—I took every means I could to check myself up—Mr. Ralph See was in the office when he asked me, and I asked Mr. See if he remembered when Mr. Ed Lukens was in there and asked me if I was going to my office, and he said he did. That was sometime in July. After I made my mind up positively certain that I could swear as a matter of fact as to where this conversation took place, I wrote Mr. Hoover this letter. Mr. Lukens was in my office so many times, and would call me places—to the Delmonte Hotel, call me to the foot of the steps, because he wasn't able to get up my steps, and call me to Mr. Roy See's offices, because he wasn't able to come upstairs, and he had so much business to transact, it was pretty hard for me to keep track of this particular instance. However, after studying the matter out, I know it was in July 1936, that he talked to me about a will. He didn't tell me he didn't have a will. This is the letter I wrote to Mr. Hoover:

'May 5, 1937.

Mr. Ben Hoover,
Attorney at Law,
Elkins, West Virginia.

Dear Sir:

As you know, I was attorney for Mr. C. Ed Lukens for some time prior to his death and did a great deal of work for him. Shortly after his death you called me on the phone and advised me that you had been employed by the widow and asked me if I knew anything about a will, or if I had any information as to whether Mr. Lukens made a will. I told you he had been in my offices some few days before his death and talked about making a will; that he was com-

plaining at the time of being sick and that I told him he had better take time and fix his business affairs but he said he had to go to Huttonsville and see about some work on a barn he was having built on the Woodford Hutton farm.

The above is the conversation, as I remember it. Since that time there has been nothing said between us on the subject of a will. I have really thought you would again mention the subject to me but since you have not I desire to correct the statement made to you. When the question about the will prepared by Mr. Muntzing arose I gave the matter of when Mr. Lukens last talked to me on the subject of a will most careful consideration, wanting to be sure as to when the above conversation took place, and I am clear that the above conversation was in the summer before he went West. He was in my office after he returned from the West but I am clear that the above conversation did not occur at that time.

I will gladly give you my reasons for changing the statement I made to you on the phone as to the time of the conversation about the will and I am willing to meet with you at any time you may desire and furnish you full information on the subject.

It is my mistake and I desire to correct it, and would have done so before this but was expecting you to see me further about the matter.

Yours truly,

E. L. MAXWELL, Atty.'

"In a day or two afterwards I was in Mr. Hoover's office about something else, and I remember it was mentioned, and Mr. Hoover asked me about that, and I explained to Mr. Hoover in detail, beginning with the condemnation case over in Dry Fork, where the County Court took his land, following with the leading transactions I had with Mr. Lukens, and when they took place, and explained to him everything in detail about it. I wanted to be absolutely certain about this matter, and those are the absolute facts which I have given you gentlemen, of which they had knowledge."

This statement and letter gives Maxwell's version of his statement to Kerens, and also one he made to B. M. Hoover, attorney for Sallie T. Lukens, on September 3, 1936. Hoover's version of that conversation follows:

"On September 3rd, 1936, before the motion was made for the appointment of the administrators, I was attempting to ascertain if Mr. Lukens had left a will. I knew Mr. Maxwell had been his attorney in certain matters. I did not know that he had been retained on an annual retainer. I called Mr. Maxwell, and either told him in express words or left him under the impression that I represented Mrs. Lukens, which I did at that time. To the best of my recollection, I do not think I could be mistaken, my conversation with Mr. Maxwell was as follows: We are trying to ascertain if Mr. Lukens left a will. Do you know anything about it? The only reply that Mr. Maxwell made to me at that time was that if he left a will it was written within a few days before his death. I think that is the exact conversation that occurred. The details given in Mr. Maxwell's letter were not stated to me at that time. It is possible that before I called Mr. Maxwell I had heard the report on the street that Mr. Lukens had been to see him about a will, but I will not be positive about that. Mr. Maxwell did not tell me on that occasion that Mr. Lukens had been to see him to get him to write a will.

"Q. Did he tell you the other part there, about Mr. Lukens being on his way to Huttonsville to see about a barn or some building put there about that time?

"A. Absolutely not; I never heard of that part until I received this letter."

The statements of Maxwell and Hoover are set out in full on account of what we conceive to be their importance, and because they involve members of the bar and counsel in the case before us.

The motion of Sallie T. Lukens to set aside the verdict of the jury, and the final decree of July 8, 1937, is based

on the following assignments of error: (1) The admission, as a finding of fact by the court, of the decree dated April 5, 1937, which established the execution of the will of August 5, 1936, and the several instructions given on behalf of the plaintiffs which added force to said decree, and the refusal of instructions offered by plaintiff in error which submitted the question of the execution of said will to the jury; (2) the refusal of the court to admit in evidence the statements of John Anderson and E. L. Maxwell with respect to the payment of the amount of the alleged bequest to William Crigler and the employment of H. G. Muntzing, his attorney, as counsel for Sallie T. Lukens; (3) the admission of the testimony revealing statements of Lukens made before the alleged execution of the will of August 5, 1936, in regard to his attitude and intentions toward persons named as legatees therein; (4) the admission of evidence of statements made by Irving Ritchie as to where the will of Lukens would be found; (5) the admission of testimony as to the value of two farms conveyed to Sallie T. Lukens in the lifetime of C. Ed Lukens; (6) the refusal of the court to require an answer to the questions propounded to H. G. Muntzing as to the terms of his employment by the plaintiff, and whether or not the same was on a contingent basis; (7) the giving of instructions 1, 2, 3, 6, 8, 9, 10, 11 and 12 offered by the plaintiffs; (8) the refusal of the court to give instructions A, 1, 2, 3, 4, 5 and 6 offered on behalf of Sallie T. Lukens. These several assignments of error will, in the main, be treated separately.

1. The decree of April 5, 1937, was admitted in evidence as "showing facts found by the court." Plaintiff's instructions Nos. 2, 3, 8, 9 and 12 tend to give added weight to this decree, and the court refused to give instruction No. 2 offered by the defense, presumably on the ground that under it the question of the execution of the will of August 5, 1936, was submitted to the jury. The question is a difficult one and our decisions give little aid in its determination. *Dower* v. *Church,* 21 W. Va. 23, and *Dower* v. *Seeds,* 28 W. Va. 113, 57 Am. Rep.

712

646, involving wills of the same testator, are the leading cases in this state on the question. The case of *Dower* v. *Church*, involved the contest of a will which had been admitted to probate by the county court, and wherein it was finally determined that the paper so admitted to probate was not the will of the testator; and the case of *Dower* v. *Seeds*, involved the establishing of a will which had been executed prior to the date of the will the probate of which had been set aside, and which had been destroyed, probably after the death of the testator, but certainly not by the testator, nor under his directions. The order of the court entered in the equity suit to establish this destroyed will, in directing the trial of the issue of *devisavit vel non*, found that the testator "did make a writing some time in the year 1868, purporting to be his will" and then proceeded to find the contents of the paper, and the issue submitted was "whether any, and if any, how much of the paper-writing so found to have been made by the said John J. Weaver in the year 1868, be the will of said John J. Weaver." By this order the pleadings in the cause were authorized to be read on the trial before the jury. In the case at bar the court, by its decree of April 5, 1937, found that "C. Ed Lukens on the 5th day of August, 1936, made, signed and acknowledged a written will as and for his last will and testament", and then found that "said will made, signed and acknowledged on August 5th, 1936, by the said C. Ed Lukens, has been revoked, lost, suppressed or destroyed." The court then found the contents of the "written will" of August 5, 1936, and on motion of the plaintiffs submitted to a jury the question "whether any, and if any, how much, of the *paper writing* aforesaid *purporting* to bear date on the 5th day of August, 1936, * * * and which *purports* to be the will of C. Ed Lukens, deceased, and which has been revoked, lost, suppressed or destroyed, is the will of the said C. Ed Lukens, deceased." (Italics ours.) The distinction between the decree establishing the will and the submission of the issue of *devisavit vel non* will be noted. One found unequivocally the execution of the will; the other

submits to a jury the question of whether a *"paper writing*—purporting"* to bear a certain date, and which *"purports"* to be the will of Lukens was in fact his will. That part of the decree which submitted this question to the jury was in proper form and included every element which might properly enter into the execution of the paper writing asserted by the plaintiffs to be a will. The question was one which either party to the controversy was entitled to have submitted to a jury as of right, Code, 41-5-11, and when thus submitted the jury had the right to consider it independently of any decree of the court, which in advance of the submission, had the effect, as plaintiffs contend, of foreclosing full and exclusive consideration of that question by the jury. Notwithstanding this contention, the plaintiffs, in the trial of the issue before the jury, introduced substantially the same testimony which they had used in obtaining the decree of April 5, 1937, and undertook to establish the due execution of the paper writing of August 5, 1936, as the will of C. Ed Lukens; after this testimony was introduced, and after the introduction of all their testimony tending to show that the will contended for had not been revoked, they offered in evidence the decree of April 5, 1937. We think (1) that the court went too far in its decree of April 5, 1936, when, in the same decree in which the issue of *devisavit vel non* was submitted, it made the absolute finding that the paper writing of August 5, 1936, was the will of C. Ed Lukens, and should not have gone beyond a finding of the execution of the paper of that date and the contents thereof; (2) that the issue of *devisavit vel non* having been properly submitted and proof on all questions included therein offered by the plaintiffs, the admission of the decree of April 5, 1937, which determined one of the questions submitted to the jury, was improper. No prejudicial error would have resulted from the entry of the decree of April 5, 1937, had the same not been admitted as evidence to establish a "fact found by the court." The admission of the decree in evidence, and the giving of the several instructions

supporting it, brings into the case the initial error of the court below.

The queston may well arise, whether, under the circumstances of this case, the error was prejudicial. The evidence of the execution of the paper writing of August 5, 1936, is clear, and there is no denial thereof; no question of the mental capacity of Lukens, or undue influence appears in the record. It may be contended that the instructions given by the court, adding weight to the decree of April 5, 1937, were warranted under the evidence introduced before the jury, and that the initial error in entering that decree, and its introduction in evidence should be overlooked, and there are plausible grounds for this contention. On the other hand, this decree touched a vital point in the case on trial before the jury, and on the issue made by the plaintiffs themselves, and we cannot undertake to gauge the effect which the introduction of the decree may have had on other issues in the case. Error in a trial is presumed to be prejudicial, and will be so considered except when it plainly appears that such error could not have affected the verdict or judgment. Taking into consideration the case as a whole, we cannot say that the errors committed in the entry of the decree of April 5, 1937, its admission in evidence as a "fact found by the court", and the giving of the several instructions in support of the decree, were not prejudicial.

2. The duty which rests on us to discuss the refusal of the trial court to admit in evidence the statements of John Anderson and E. L. Maxwell with relation to a proposed payment to William Crigler and attendant circumstances, as bearing upon the testimony of said Maxwell on other points in the case, is both delicate and unpleasant. We shall not discuss the ethical or moral question involved, or the good faith, or lack thereof, on the part of any of the individuals concerned. We are only concerned with admitted facts, and these are: A few days after the death of C. Ed Lukens, E. L. Maxwell met John Kerens on the streets of Elkins and told him that Lukens had been at his office a few days prior to his death

and had asked him to prepare a will for him; on September 3, 1936, according to his own statement, Maxwell told B. M. Hoover that Lukens had been in his office some few days before his death and talked about making a will. A slight conflict exists between the statements of Maxwell and Hoover, as reference to their testimony hereinbefore quoted will disclose. Notwithstanding these statements, Maxwell testified on the trial that Lukens talked with him about a will prior to August 5, 1936, the date when the paper was executed at Moorefield. Shortly after November 3, 1936, Maxwell suggested to John Anderson that he suggest to Sallie T. Lukens and her counsel that they pay to William Crigler $7,500.00, the amount bequeathed to him by the alleged will, and then employ Crigler's counsel as her attorney. At that time, H. G. Muntzing had been employed as attorney by Crigler in connection with this will with the understanding on Crigler's part that Maxwell was to be associated with him in the matter, and Muntzing had consulted Maxwell; but both Maxwell and Muntzing deny in statements to the court, not as witnesses, that there had been any employment of Maxwell at the date of his conversation with Anderson. Crigler thought he was employed at that time. Not until May, 1937, months after this suit was instituted and after the decree submitting the issue of *devisavit vel non* to the jury and when there could be no question as to his employment by the plaintiffs, did Maxwell disclose to counsel for Sallie T. Lukens that his statement as to the time of conversation with C. Ed Lukens about his will was incorrect. The effect of Maxwell's testimony, if he had adhered to the statements made by him to Kerens and Hoover cannot easily be exaggerated. The statement of Maxwell, regular counsel of Lukens, that a few days before his death, Lukens had requested him to write a will, might well have been accepted by the jury as conclusive on either one of two points (1) that he had revoked or destroyed any former will made by him; or (2) that he was dissatisfied with such former will and desired to execute a new one to take its place. Subsequent

to Maxwell's original statement he was employed by the plaintiffs. The actual date of his employment is not controlling. When Maxwell talked with John Anderson and made the suggestion he did, he knew that there was to be a controversy over the alleged will made at Moorefield; he knew that his statements to Kerens and Hoover would be material on that controversy, and he could not have been oblivious of their possible effect. There is nothing in the record showing the date when Maxwell decided to change his statement; if it was before his conversation with Anderson, then, at that time he well knew the embarrassment to which he would be subjected by such a change on this all-important question, and he may have sought to avoid this embarrassment by settling the matter by a payment to Crigler, the employment of Crigler's counsel as attorney for Sallie T. Lukens, and, presumably, the suppression of the paper of August 5, 1936, if it existed as a will at the date of Lukens' death, with the resultant fraud on the rights of others who were provided for therein. His own statement that his suggestion was only a friendly act to save Anderson from embarrassment may be accepted as true as a part explanation of what he did, but the suggestion he made, with all its imports and consequences, involves more than this, and creates a situation calling for a full development before the jury of all the facts bearing upon the conflicting statements of the witness on this important element of the case. The lengthy statement of the facts set out herein shows the case to be one wherein the verdict of a jury would have controlling weight on the main issue involved, and it is therefore peculiarly a case where the jury should have had before it for consideration all the pertinent facts bearing thereon. We think the court should have admitted the statements of Anderson and Maxwell as to the suggestion mentioned, and that it was reversible error not to do so.

3. While the presumption of revocation arising from the loss of a will makes the testator's character, surrounding conditions, acts and declarations, and the con-

duct of those around him, after the date of the will, the subject of inquiry, *In Re Gardner's Estate*, 164 Pa. State 420, 30 Atl. 300, therefore justifying the admission of the testimony tending to show the existence of the paper executed on August 5, 1936, at the date of Lukens' death, *Steinke's Will*, 95 Wis. 121, 70 N. W. 61, we do not think the rule should be applied in this case to statements of Lukens made before, and, in some instances, years before the execution of this paper. Had there been a question of the mental capacity of the testator, or one of undue influence, such testimony would, within reasonable limits, have been admissible as bearing on what the testator had in mind with reference to the disposition he desired to make of his property. Under the circumstances of this case, we think the admission of testimony as to statements made by Lukens in regard to his attitude toward his former wife, William Crigler and the Franklin Presbyterian Church, was error. This is peculiarly true when considered with the claim of the plaintiffs that the decree of April 5, 1937, established the execution of the paper writing of August 5, 1936, and the contents thereof, as a will. If this contention be true, there was no necessity for testimony of statements of the alleged testator to support the paper, as its contents were already established by the court. Aside from this contention, the case is not one in which such testimony was properly admissible.

4. The testimony of William Crigler and John Anderson disclosing what Irving Ritchie told them as to where the will of Lukens would be found, should not have been admitted, but by reason of the uncertainty as to what Ritchie said, and the comparative unimportance of the testimony, we do not regard its admission reversible error.

5. The admission of testimony as to the value of two farms conveyed to Sallie T. Lukens in the lifetime of C. Ed Lukens was not warranted under the circumstances of this case. If the contents of the paper executed by Lukens on August 5, 1936, were in dispute, and an explanation with respect to the language contained therein

in reference to said farms called for, then such testimony would have been admissible. On the question of the revocation of said paper, or its suppression or destruction, such testimony was not pertinent.

6. The court should have required an answer to the questions propounded H. G. Muntzing as to his contract for services as counsel for the plaintiffs, whether contingent on recovery or otherwise, *Moats* v. *Rymer,* 18 W. Va. 642, 41 Am. Rep. 703; but we cannot say that the defendants were prejudiced by the court's action in sustaining objections to these questions. There is nothing in the record to show what the answer to the questions would have been. The action of the court would have been prejudicial only in the event that the answers revealed that the fee was contingent upon recovery. In such an event, the jury would have had the right to consider that fact as bearing on the interest of the witness in the success of the plaintiffs.

7. We have already considered plaintiffs' instructions Nos. 2, 3, 8, 9 and 12, bearing as they do on the admission in evidence of the decree of April 5, 1937, and it will not be necessary to further discuss them on that point. Instruction No. 1 is abstract, and it is difficult to see on what theory it was given, unless it was to advise the jury that the widow of C. Ed Lukens would not be bound by its finding if it affected her right to one-third of the net personal estate after payment of debts, funeral expenses and costs of administration, and her right to one-third of his real estate for life, which rights she could save to herself by renouncing the will if established. The instruction should not have been given. It has absolutely no bearing on the questions in issue, and could only have the effect of telling the jury that the asserted will could be upheld without imposing too great a hardship on the widow of the testator. Instruction No. 6 merely told the jury that it could consider the interest which the persons who had possession of the grip in which it is contended the will was placed had in the destruction or suppression of the will. We do not understand the instruction to say

that any presumption is raised against said parties; but merely that their possession of the grip in which the will is claimed to have been placed, and their interest in its loss, destruction or suppression may be considered. We think the instruction was proper. We see no reversible error in instruction No. 10. It has no place in the case, but it could have had no prejudicial effect on any party to the controversy. There was evidence that Lukens told Leatherman that the will witnessed by him was in his grip, and also that after Lukens went to the hospital he was not physically able to have arisen from his bed and destroyed the will stated by him to be in the grip. Instruction No. 9 does no more than tell the jury that such testimony might be considered with all other evidence to overcome the presumption raised by law that a will executed and remaining in the possession of the testator, but not found on his death, has been destroyed by him, or under his direction with intention to revoke.

The consideration of instruction No. 8 calls for a more extended discussion. The first part of the instruction has already been discussed, the same bearing on the effect to be given to the decree of April 5, 1937. The concluding part of the instruction will now be taken up. It reads:

"And the Court further instructs you that if the weight of the evidence proves that the personal and private papers of C. Ed Lukens went into the hands of interested parties shortly after the death of C. Ed. Lukens, who had an opportunity and motive for destroying or suppressing said will, then you are instructed that under such circumstances less proof is required of the plaintiffs to establish the existence of said will at the time of the death of C. Ed Lukens, or that C. Ed Lukens did not in his life time revoke said will."

It will be noted that this instruction tells the jury that "less proof" is required of the plaintiffs to establish two things: (1) "the existence of said will at the time of the death of C. Ed Lukens;" and (2) "or that C. Ed Lukens

did not in his lifetime revoke said will." We are unable to reconcile these two propositions, which are in fact one, with other well established principles.

A will duly executed by a testator, but destroyed without his knowledge still remains his will. *Kitchens* v. *Kitchens*, 39 Ga. 168, 99 Am. Dec. 453; *Dickey* v. *Malechi*, 61 Mo. 177, 34 Am. Dec. 130; *Dower* v. *Seeds*, 28 W. Va. 113, 57 Am. Rep. 646. But to establish a last will and the contents thereof the evidence must be full, clear and convincing. *In Re Colbert's Estate*, 31 Mont. 461, 78 Pac. 971, 80 Pac. 248, 107 Am. St. Rep. 439, 3 Ann. Cas. 952; *Kitchens* v. *Kitchens, supra;* 28 R. C. L. 380. When the execution of a will is established, and the same is retained by the testator, and on his death is not found among his papers or elsewhere, a presumption of fact arises that it has been destroyed by him with the intention to revoke. *Re Bates' Estate*, 286 Pa. 583, 134 Atl. 513, 48 A. L. R. 294; *Jackson* v. *Hewlett*, 114 Va. 573, 77 S. E. 518; 1 Harrison on Wills, sec. 148; *In Re Colbert's Estate, supra; In Re Taylor Estate*, 271 Mich. 404, 260 N. W. 895; *Williams* v. *Miles*, 68 Neb. 463, 94 N. W. 705, 96 N. W. 151, 62 L. R. A. 383, 110 Am. St. Rep. 431, 4 Ann. Cas. 306; *Scott* v. *Maddox*, 113 Ga. 795, 39 S. E. 500, 84 Am. St. Rep. 263; *In Re Havel's Estate*, 156 Minn. 253, 194 N. W. 633, 34 A. L. R. 1300, and note; *Behrens* v. *Behrens*, 47 Ohio St. 323, 25 N. E. 209, 21 Am. St. Rep. 820; 28 R. C. L. 380. But this presumption is a rebuttable one and must give way to proof and circumstances clearly showing the loss, destruction or suppression of the will by some one other than the testator. In the case at bar there is no evidence showing or tending to show that the paper dated August 5, 1936, established as a will, was ever out of the possession of the testator; in fact, the plaintiffs rests their case on the presumption that it continued in his possession up to the instant of his death. No one ever saw this paper after it was executed, and on Lukens' death it was not found in his papers or elsewhere. Therefore, the presumption arose that it had been destroyed by him with intention to

721

revoke. To rebut this presumption, the plaintiffs rely (1) on testimony tending to show that the will was in possession of the testator when he died; and (2) that persons who would benefit by the loss, destruction or suppression of the will had custody of the grip which they contend contained the will after the death of the testator, and they ask the court to infer that being interested in doing so, these parties did destroy or suppress the will. On no other ground can the instruction given be defended. If less proof is required to establish the existence of the alleged will at the time of the death of Lukens, then the explanation must be that the law charges the interested parties, who may have had an opportunity to destroy or suppress the will, with having done so. But the authorities say that such an inference or charge may not be made. 1 Page on Wills 1321; 68 Corpus Juris, 1028, sec. 814; *Holler* v. *Holler*, 298 Ill. 418, 131 N. E. 663; *Scott* v. *Maddox, supra*; *Canterberry* v. *Canterberry*, 120 W. Va. 310, 197 S. E. 809. In the case last cited, this Court held:

> "Where an issue is raised as to who mutilated a will, a mere showing of an opportunity on the part of a person who would benefit by its destruction does not of itself establish that such person actually mutilated it."

Of course, such interest and opportunity may be considered, and instruction No. 9, which we have approved, so told the jury. Then, if less proof is required, how much less? Under this instruction the jury might well have considered that very little proof was required to overcome the presumption of the revocation of the will, and yet all authorities say such proof must be full, clear, and convincing. The instruction tended to confuse the jury, invaded its province and should not have been given. The case cited to support the instruction, *In Re Calef's Will*, 109 N. J. Eq. 181, 156 Atl. 475, was based on facts which established that an executed will was placed in the possession of one whose interest lay in its

destruction, before the death of the testator, and does not bear on a case when the opportunity to destroy the will does not arise until after his death. We think the giving of instruction No. 8 was reversible error.

8. Aside from the error involved in refusing to submit to the jury the question of the execution of the paper writing of August 5, 1936, as a will, we do not think the court erred in refusing instructions A and Nos. 1 to 6, inclusive, offered on behalf of Sallie T. Lukens, when considered with the fact that instructions 1A to 6A were given at her instance. The instructions given fairly present the contention of the defendant.

We would reverse the decree of the Circuit Court of Randolph County complained of and remand the case for further proceedings not in conflict with the opinions herein expressed, but Judges Kenna and Riley being of the opinion that the decree of said court should be affirmed, and a majority of the court not being of the opinion to reverse the said decree, it therefore stands affirmed.

*Affirmed.*